*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *REGIONAL SCHOOL UNIT NO. 51,* | ) | |
| | ) | |
| *Plaintiff/Counterclaim Defendant* | ) | |
| | ) | |
| *v.* | ) | *No. 2:12-cv-29-DBH* |
| | ) | |
| *JOHN DOE, et al.,* | ) | |
| | ) | |
| *Defendants/Counterclaim Plaintiffs* | ) | |

*RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW*

The plaintiff, Regional School Unit No. 51 ("District"), appeals portions of decisions of a Maine Department of Education ("MDOE") hearing officer ("Hearing Officer") finding in favor of defendants John Doe and Jane Doe ("Parents") and awarding them reimbursement of monies paid to send their child ("SM") to a residential private school in 2010-11 as compensatory education for the District's failure to identify SM as eligible for special education from September 2007 to March 2010. *See* Plaintiff's Memorandum of Law in Support of Appeal ("District's Brief") (ECF No. 19) at 1-2. The Parents cross-appeal that portion of the Hearing Officer's decisions finding in favor of the District with respect to its offer of special education services to SM for the 2011-12 school year. *See* Defendants' Memorandum of Law ("Parents' Brief") (ECF No. 20) at 28-33. In addition, they seek reimbursement of their attorney fees and costs on the basis that they are the prevailing parties in this action. *See id.* at 33-34.

After careful review of the parties' memoranda and the entire record filed in this case, including a supplemental affidavit that Mr. Doe was permitted to file, *see* Declaration of John Doe ("John Doe Decl.") (ECF No. 14-1), attached to Defendants' Motion To Permit Presentation of Additional Evidence (ECF No. 14), I propose that the court adopt the following findings of fact and conclusions of law, on the basis of which I recommend that judgment be entered in

favor of the Parents on the District's appeal and in favor of the District on the Parents' cross-appeal. Consideration of the Parents' further request for reimbursement of their legal fees and costs is premature. Hence, I recommend that the court defer action on that request pending the final adjudication of this appeal, at which time the Parents may submit any applications for attorney fees and costs in accordance with Local Rules 54.2 and 54.3.

## I.  Proposed Findings of Fact

### A.  Fourth Grade, Longfellow School, 2005-06

1.      SM is now 16 years old.  Special Education Due Process Hearing [Decision] ("Hearing Decision"), [M] v. RSU #51, Case No. 11.107H; RSU #51 v. [M], Case No. 12.013H (Me. Dep't of Educ. Nov. 8, 2011), at 3, ¶ 1;[1] Administrative Record ("Record") at 984.  He attended private schools through the third grade, Testimony of Jane Doe ("Ms. Doe") at 11,[2] then attended the Longfellow School ("Longfellow") in the Portland School District for fourth grade (2005-06), Hearing Decision at 3, ¶ 2; Record at 149.  He was referred for special education in January 2006 due to difficulty completing independent academic work, following multiple-step directions, remaining seated, and maintaining focus, as well as due to an inconsistent short-term memory and weak organizational skills.  Hearing Decision at 3, ¶ 2; Record at 151.

2.      In March 2006, the Parents hired Marcia Hunter, Ph.D., to evaluate SM.  Hearing Decision at 3, ¶ 3; Record at 984.  Dr. Hunter concluded that he was bright, with an IQ in the 86th percentile, but presented with an atypical interpersonal style and was introverted,

---

[1] For ease of reference, I shall refer to the consecutively numbered pages of the Hearing Decision rather than the Record pages where it is found, pages 1427 to 1471.  Likewise, I shall refer to the consecutively numbered pages of the Hearing Officer's Order on Application of Statute of Limitations ("Limitations Decision"), [M] v. RSU #51, Case No. 11.107H; RSU #51 v. [M], Case No. 12.013H (Me. Dep't of Educ. Sept. 1, 2011), rather than the Record pages where it is found, pages 1296 to 1313.  I have drawn my proposed facts from the Hearing Officer's findings, supplemented by additional Record information and the John Doe declaration.

[2] When citing hearing testimony, I shall refer to the consecutively numbered pages of the five-day hearing transcript, contained at pages 1503 to 1801 of the Record, rather than to Record pages.

withdrawn, and possibly anxious and depressed.  Hearing Decision at 3, ¶ 3; Testimony of Marcia Hunter, Ph.D. ("*Hunter*") at 197.  Dr. Hunter noted that SM had been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") in 2003.  Hearing Decision at 3, ¶ 3; Record at 984.  She concluded that he had advanced thinking abilities that required encouragement and support, as well as serious impairments in executive mental functions and processing speed. Hearing Decision at 3, ¶ 3; *Hunter* at 201; Record at 998-1005.  She made a variety of recommendations regarding his education, including creating stimulating and diverse learning opportunities to address his deficits in mental speed and focus, using familiar materials and personal interests to increase his focus on mundane tasks, using divergent assessment procedures to provide him with positive feedback, and monitoring his reliance on fantasy as a means to feed his intellectual hunger.  Hearing Decision at 3, ¶ 3; Record at 998-99.  She also recommended an occupational therapy evaluation to address his fine motor weaknesses and lack of automatic transcription skills, as well as direct instruction in keyboarding skills.  Hearing Decision at 3, ¶ 3; Record at 999.

3.      At nearly the end of the school year, in May 2006, SM was identified as eligible for special education services under the category of "Other Health Impaired" as a result of his ADHD and executive functioning deficits.  Hearing Decision at 3, ¶ 4; Record at 166.  He received special education services for approximately the final two months of the school year. Hearing Decision at 3, ¶ 4; *Ms. Doe* at 10.  His Individualized Education Program ("IEP") called for a series of classroom and homework accommodations as well as direct special education instruction for three-and-a-half hours per week and special education consultation with SM's team.  Hearing Decision at 3, ¶ 4; Record at 170-71.

4.      At the time that SM entered special education at Longfellow, his mother signed a consent form allowing the school to conduct an evaluation of him, which indicated that a Statement of Procedural Safeguards was attached.  Limitations Decision at 2, ¶ 4; Record at 149-50.  The Parents also received other notices in the winter and spring of 2006 indicating that a Statement of Procedural Safeguards was attached or enclosed.  *See* Record at 151-52, 160, 177.  The Parents do not recall ever receiving a Statement of Procedural Safeguards from the Portland School District and have not been able to locate a copy of such safeguards in their records.  Limitations Decision at 2 ¶ 4; *Ms. Doe* at 75; Testimony of John Doe ("*Mr. Doe*") at 99.

### B.  Fifth Grade, Breakwater School, 2006-07

5.      SM attended a private school, the Breakwater School ("Breakwater") in Portland, for his fifth grade year (2006-07).  Hearing Decision at 3, ¶ 5; *Ms. Doe* at 11, 16.  During that year, the Parents arranged for a family-funded tutor to attend school with him for much of the day.  Hearing Decision at 3, ¶ 5; *Ms. Doe* at 11-13.  The tutor met with him before school and assisted him throughout the day, spending a total of 10 to 20 hours per week with him.  Hearing Decision at 3-4, ¶ 5; *Ms. Doe* at 12.  SM did very well academically and gained self-confidence.  Hearing Decision at 4, ¶ 5; Record at 952-72.  However, despite the presence of the tutor, SM's teachers reported continuing problems, including that SM had difficulty following multi-step directions, could lose sight of the overall goal of an activity, needed extra assistance in planning and organizing assignments, was easily distracted and influenced by other students, and had difficulty maintaining focus for entire class periods.  Hearing Decision at 4, ¶ 5; Record at 959, 961-62, 969, 971.

## C.  Sixth Grade, Greely Middle School, 2007-08

6.        SM enrolled in RSU #51 in the fall of 2007, after his family moved to North Yarmouth.  Limitations Decision at 2, ¶ 6; Record at 944-45.  He attended sixth (2007-08), seventh (2008-09), and eighth (2009-10) grades at Greely Middle School ("GMS").  Limitations Decision at 2, ¶ 6; *Ms. Doe* at 57-58.

7.        Roberta Goodwin, a GMS school counselor, met with Ms. Doe in August 2007 to prepare for SM's transition to GMS.  Hearing Decision at 4, ¶ 7; Testimony of Roberta L. Goodwin ("*Goodwin*") at 132-34.  Ms. Doe filled out a form that indicated that SM had been diagnosed with ADHD, had a tutor for fifth grade, and needed reminders to write down homework assignments, and that the family had SM's prior IEP and his March 2006 evaluation. Hearing Decision at 4, ¶ 7; Record at 194.  Ms. Goodwin was SM's school counselor for his three years at GMS.  Hearing Decision at 4, ¶ 7; *Goodwin* at 614.

8.        During her meeting with Ms. Goodwin, Ms. Doe shared SM's school history, reiterated his diagnosis of ADHD, and indicated that he had some struggles in the past, although Ms. Doe did not appear worried about his transition.  Hearing Decision at 4, ¶ 8; *Goodwin* at 133-34.  Ms. Goodwin subsequently received SM's prior educational records, including his records from Breakwater, his IEP from Longfellow, and his March 2006 evaluation by Dr. Hunter.  Hearing Decision at 4, ¶ 8; *Goodwin* at 135-36.  Ms. Goodwin forwarded that information to Carol Nale, the special education teacher at GMS.  Hearing Decision at 4, ¶ 8; *Goodwin* at 137-38.

9.        On September 18, 2007, Ms. Nale emailed Ms. Doe to inquire as to whether SM had a current IEP.  Hearing Decision at 4, ¶ 9; Record at 197.  Ms. Doe responded that he did not, indicated that Breakwater did not offer such an "evaluation," and asked whether it would be

appropriate to evaluate SM again and how the family should move forward to obtain support for him at school.  *Id.*

10.    Beginning in mid-September and continuing through October, SM's teachers observed that he required a great deal of adult support to complete in-class assignments, had difficulty following instructions, and required frequent check-ins and prompts, that he would benefit from the use of a math tutor, and that he at times "shut down" when faced with difficult assignments, saying that he would never be able to get them done.  Hearing Decision at 4, ¶ 10; Record at 195-96, 198-99.

11.    On September 25, Ms. Nale responded by email to Ms. Doe's query, indicating that, because SM's IEP had expired and he had not received special education services at Breakwater the prior year, he was not receiving special education services at GMS.  Hearing Decision at 4, ¶ 11; Record at 199.  She went on to state that SM's teachers were working with him to meet his needs and that the Parents could choose to meet with his team by contacting his team leader Carol Pappas, one of his regular education teachers.  Hearing Decision at 4-5, ¶ 11; Record at 199.  She advised that, if the Parents sought a team meeting, the team could talk about how best to meet SM's needs and "look at the need to refer him for special education evaluation/services."  Hearing Decision at 5, ¶ 11; Record at 199.  Ms. Goodwin believed that Ms. Nale's email indicated that, if the family sought special education for SM, GMS would need to re-refer him to special education and evaluate him because his IEP had expired.  Hearing Decision at 5, ¶ 11; *Goodwin* at 139.

12.    Ms. Doe was in regular communication with Ms. Pappas and, on September 26, asked to meet with SM's teachers.  Hearing Decision at 5, ¶ 12; Record at 138.  Ms. Doe was under the impression that SM did not qualify for special education services without further

evaluation but was amenable to the suggestion that SM's teachers be used as support for him. Hearing Decision at 3, ¶ 12; *Ms. Doe* at 24.

13.     On October 30, while meeting with Ms. Doe, Ms. Goodwin emailed Penelope Wheeler-Abbott, the assistant principal at GMS and the facilitator of most of the IEPs for students attending school there.   Hearing Decision at 5, ¶ 13; Record at 203-04; Testimony of Penny Wheeler-Abbott ("*Wheeler-Abbott*") at 168.   Ms. Goodwin indicated that, although Ms. Nale had understandably recommended reevaluating SM, she and Ms. Doe were concerned about the impact of testing on him, including possible lost class time, invasive testing, and self-esteem issues.   Hearing Decision at 5, ¶ 13; Record at 204.   Ms. Goodwin suggested a meeting to discuss providing SM services pursuant to section 504 without doing further testing.   *Id.*[3]   Ms. Goodwin left the October 30 meeting feeling that Ms. Doe was hesitant to refer SM to special education because she did not want him removed from the school for testing or singled out for individual education.   Hearing Decision at 5, ¶ 13; *Goodwin* at 144-45.

14.     On October 31, Ms. Goodwin noted in an email that she had brought SM up at a "guidance/A-team meeting" and that the consensus was that there should be a team meeting to discuss him at more length.   Hearing Decision at 5, ¶ 14; Record at 1006.   Ms. Goodwin noted that Ms. Doe was "balking a little at a referral" but questioned whether bypassing a referral would cause SM not to receive all of the services he needed.   *Id.*   Ms. Goodwin then asked to meet with Ms. Wheeler-Abbott and Ms. Nale to discuss SM.   *Id.*   Ms. Wheeler-Abbott perceived that, because of the May 2007 expiration of SM's IEP and his attendance at a private school the

---

[3] "Section 504" refers to section 504 of the federal Rehabilitation Act, which prohibits public school districts, among others, from discriminating against individuals with disabilities.  *See* 29 U.S.C. § 794(a) & (b)(2)(B).   Regulations implementing this provision require school districts to provide a free appropriate public education ("FAPE") "to each qualified handicapped person who is in the [school district's] jurisdiction, regardless of the nature or severity of the person's handicap."  34 C.F.R. § 104.33(a).

prior year, he would need to be retested before he could be identified as in need of special education. Hearing Decision at 5, ¶ 14; *Wheeler-Abbott* at 183-84. Ms. Wheeler-Abbott expected that the process would consist of the Parents consenting to an evaluation, the District conducting the evaluation within a 45-day time frame, SM's IEP team meeting to review the evaluation and deciding whether SM was eligible, and the creation of an IEP for SM if he were eligible. Hearing Decision at 5, ¶ 14; *Wheeler-Abbott* at 184. She perceived that Ms. Doe had concerns about the impact of additional testing on SM and wished to explore other options that did not involve reevaluation. Hearing Decision at 5, ¶ 14; *Wheeler-Abbott* at 175-76.

15. On October 31, Ms. Goodwin emailed Ms. Doe to indicate that she and Ms. Wheeler-Abbott had decided that they could not determine whether SM should be referred to special education without having a meeting with his teachers. Hearing Decision at 5, ¶ 15; Record at 207.

16. From the District's perspective, SM arrived outside of eligibility for special education and needed to be considered as an initial referral for consideration, if he was going to receive special education services. Hearing Decision at 6, ¶ 16; *Wheeler-Abbott* at 183-85. The District did not discuss with the family the possibility of convening an IEP team meeting for SM or of determining his eligibility based on prior testing and records. Hearing Decision at 5, ¶ 16; *Goodwin* at 156-57, 160-61.

17. On November 1, Mr. Doe reported to Ms. Goodwin that SM seemed very upset about school and had a breakdown during which he reported that he liked the school but felt stupid, could not stay focused or keep up, and did not have enough support. Hearing Decision at 6, ¶ 17; Record at 205.

18.     On November 9, the Parents met with Ms. Wheeler-Abbott, Ms. Goodwin, Ms. Pappas, and two other regular education teachers.  Hearing Decision at 6, ¶ 18; Record at 1007.  In addition, Dr. Hunter, who had evaluated SM in 2006, attended at the Parents' invitation.  Hearing Decision at 6, ¶ 18; Record at 208, 1007.  No special educator was present, and the Parents did not meet with anyone in the special education department during the fall of 2007.  Hearing Decision at 6, ¶ 18; *Wheeler-Abbott* at 182; *Ms. Doe* at 36-37.  Ms. Doe, when inviting Dr. Hunter, indicated that SM's team was meeting and that the Parents' goal was to get him some support without going through another evaluation.  Hearing Decision at 6, ¶ 18; Record at 208.

19.     At the November 9 "staffing" meeting, the group discussed SM's performance at school, his anxieties, his difficulties, and his strengths and weaknesses.  Hearing Decision at 6, ¶ 18; Record at 1007-08.  School staff perceived that one of the purposes of the meeting was to determine whether SM should receive section 504 services or special education.  Hearing Decision at 6, ¶ 19; *Wheeler-Abbott* at 177-78; *Goodwin* at 147.  Although Ms. Wheeler-Abbott typically presents special education as an option at such meetings, she did not recall whether she did so at the November 9 meeting.  Hearing Decision at 6, ¶ 19; *Wheeler-Abbott* at 178.  The Parents did not recall any discussion of special education as an option.  Hearing Decision at 6, ¶ 19; *Ms. Doe* at 86; *Mr. Doe* at 108.

20.     At the time, the Parents did not understand the difference between services offered under section 504 and those provided pursuant to special education laws.  Limitations Decision at 5, ¶ 18; *Ms. Doe* at 34-35; *Mr. Doe* at 107-08.  The Parents' primary concern was that SM receive sufficient support to be successful in school.  Limitations Decision at 5, ¶ 18; *Ms. Doe* at 37-38; *Mr. Doe* at 107-08.  Mr. Doe interpreted section 504 accommodations as an

option involving special education that provided fewer services but would not require retesting SM. Limitations Decision at 5, ¶ 18; *Mr. Doe* at 125-26. The Parents continued to believe that SM was not eligible for special education without further testing, based on the District's statements. Limitations Decision at 5, ¶ 18; *Ms. Doe* at 35; *Mr. Doe* at 128-29. Ms. Wheeler-Abbott's meeting notes indicate that the group was "[l]ooking more for the 504 route and to provide the emotional and mental breaks during the day." Limitations Decision at 6, ¶ 20; Record at 1008.

21.     School staff at the meeting concluded that all of Dr. Hunter's proposed accommodations could be implemented through the section 504 plan. Limitations Decision at 5, ¶ 19; Record at 1239-40; *Goodwin* at 150. Ms. Goodwin and Ms. Wheeler-Abbott perceived that everyone at the meeting, including Dr. Hunter, felt that the necessary accommodations could be accomplished through a section 504 plan for SM. Limitations Decision at 5-6, ¶ 19; *Goodwin* at 150, 153-54; *Wheeler-Abbott* at 179-80.

22.     The section 504 plan called for, among other things, the provision of emotional, mental, and physical breaks; the implementation by SM's teachers of a positive reinforcement program for focused attention; the modification of SM's homework assignments; the use by SM of his computer, whenever possible, to complete assessments and assignments; the selective pairing of SM with students who worked well with him; and an invitation to SM to join a social skills group with the school counselor. Hearing Decision at 7, ¶ 22; Record at 940.

23.     After the November 9, meeting, Dr. Hunter had no role with SM or school staff until the fall of 2009, during SM's eighth-grade year. Hearing Decision at 6, ¶ 18; *Hunter* at 213-14.

24.     Throughout SM's sixth-grade year, he struggled with academics and with depression and suicidal ideation.  Hearing Decision at 7, ¶ 21; *Ms. Doe* at 39-48; Record at 209-12, 215, 217, 234-35.

25.     Ms. Goodwin met with SM weekly for 30 minutes, mainly in a group with one other boy, throughout his time at GMS.  Hearing Decision at 7, ¶ 23; *Goodwin* at 642-44, 652. She worked with him on social skill building and shared information from her sessions with Ms. Doe.  Hearing Decision at 7, ¶ 23; *Goodwin* at 642-44.

26.     In Maine Educational Assessment ("MEA") testing in March 2008, SM partially met standards in reading and did not meet standards in math.  Hearing Decision at 7, ¶ 24; Record at 213-14.  That same month, Ms. Pappas reported to the Parents that SM continued "to be off task in all of his content classes, distracting himself and others, and really not interested in school work. He is more concerned with objects and creating inventions out of classroom and cafeteria materials.  This is interfering with working in class and completing assignments." Hearing Decision at 7, ¶ 24; Record at 215.

27.     In May 2008, three of SM's sixth-grade teachers completed assessment forms at the request of SM's pediatrician.  Hearing Decision at 7, ¶ 25; Record at 218-26.  Each of the teachers independently reported that SM very often (the highest rating) failed to give attention to details or made careless mistakes in schoolwork, had difficulty sustaining attention to tasks or activities, did not seem to listen when spoken to directly, did not follow through when given directions and failed to finish activities, had difficulty organizing tasks and activities, avoided, disliked, or was reluctant to engage in tasks that required sustained mental effort, lost things necessary for tasks or activities, was easily distracted by extraneous stimuli, was forgetful in daily activities, fidgeted with his hands or feet or squirmed in his seat, left his seat when

11

expected to remain seated, and actively defied or refused to comply with adults' requests or rules.  Hearing Decision at 7-8, ¶ 25; Record at 218, 221, 224.

28.     The teachers also reported that SM's performance was somewhat of a problem or problematic (the two highest ratings) in reading, math, and written expression.  Hearing Decision at 8, ¶ 25; Record at 219, 222, 225.  Ms. Pappas, SM's language arts and math teacher, commented that she was "very concerned about [SM].  He is unfocused and unwilling to do work during class.  He is 'in his own world' most of the time during class.  It is as if he is listening to a tape in his mind.  He does not seem happy."  Hearing Decision at 8, ¶ 25; Record at 225.  Nancy Lane, SM's science teacher, reported that he "does not seem to like school.  He fixates on 2 students and wants to be their friend.  He is often in another place in his mind.  He gets distracted, this precludes him from getting his thoughts on paper, on the computer or verbalized.  He will get distracted and [it is] very difficult to get him to refocus.  Breaks, rewards and threatening to not allow him to 'hang' with his friends during mastery works sometime[s] (not frequently)."  Hearing Decision at 8, ¶ 25; Record at 222.

29.     All three teachers gave SM a six (a "very severe impairment" on a scale of one to seven) in the following domains of function: ability to comply with school rules, adult commands, or general behavioral expectations; ability to form and maintain positive peer relationships; ability to express or control emotions; and ability to perform daily school tasks and responsibilities.  Hearing Decision at 8, ¶ 25; Record at 220, 223, 226.

30.     Ms. Goodwin, who did not see these evaluations, testified that although SM had work completion issues, his section 504 plan was supporting him sufficiently, he was progressing academically, and the quality of his work was fine if completed.  Hearing Decision at 8, ¶ 25; *Goodwin* at 622, 625.

31.     SM's May 2008 Northwest Evaluation Association ("NWEA") testing scores revealed a reduction from the 74th percentile in the fall to the 34th percentile in the spring in reading, and from the 44th percentile in the fall to the 40th percentile in the spring in math. Hearing Decision at 8, ¶ 26; Record at 236.

32.     In late May, Ms. Doe informed SM's teachers that he was under intense supervision at home due to symptoms of severe depression.  Hearing Decision at 8, ¶ 27; Record at 217.

33.     The Parents did not feel that the section 504 accommodation plan helped SM succeed academically, although it did reduce his work level, which reduced his stress level. Hearing Decision at 8, ¶ 28; *Mr. Doe* at 108-11.  SM continued to struggle with homework.  *Id*. On his final report card in sixth grade, he received many rankings indicating that he was meeting expectations but also many indicating that he was partially meeting expectations and four indicating that he was not meeting expectations.  Hearing Decision at 8, ¶ 28; Record at 234-35.[4] SM's teachers graded his work habits as needing improvement in nearly all classes for each trimester and his conduct as needing improvement in several classes each trimester.  *Id*.

### D.  Seventh Grade, Greely Middle School, 2008-09

34.     After sixth grade ended, the Parents hired Ms. Pappas to tutor SM throughout the summer and into the fall.  Hearing Decision at 8-9, ¶ 29; *Mr. Doe* at 111-12.  In October 2008, Ms. Pappas reported that she did not have the time to continue as SM's tutor.  Hearing Decision at 9, ¶ 29; *Mr. Doe* at 112.

---

[4] Throughout sixth grade, SM also was ranked as exceeding expectations in almost all aspects of computer technology.  Record at 235.  He also was ranked as exceeding expectations in some components of art, physical education, technology, and health.  *Id*.

35.     Also in October 2008, SM's team met to review his section 504 plan.  Hearing Decision at 9, ¶ 30; *Goodwin* at 626.  There were no substantive changes to SM's section 504 plan during his seventh-grade year.  Hearing Decision at 9, ¶ 30; Record at 934.  At the meeting, Mr. Doe informed school staff that SM felt very overwhelmed and like a failure.  Hearing Decision at 9, ¶ 30;  Record at 1009.  SM continued to struggle with homework completion, and his emotional state at home worsened.  Hearing Decision at 9, ¶ 30; *Mr. Doe* at 113.  Mr. Doe felt that his relationship with SM was greatly stressed during SM's seventh-grade year by his efforts to try to get SM to complete homework, causing him to "los[e] [SM] in terms of my relationship" after having been "very, very tight" with him.  Hearing Decision at 9, ¶ 30; *Mr. Doe* at 113, 368, 954-55.

36.     During seventh grade, the Parents offered to buy SM a computer if he achieved certain grades.  Hearing Decision at 9, ¶ 31; *Mr. Doe* at 114.  This resulted in a short-lived improvement in SM's homework completion but ultimately backfired because SM felt significant pressure.  *Id*.  Four of SM's seven grades rose in the second trimester, but three dropped in the third trimester.  Hearing Decision at 9, ¶ 31; Record at 250.  SM's third-trimester grades included five in the B range, one in the C range, and one in the D range.  Hearing Decision at 9, ¶ 31; Record at 250.[5]

37.     School staff believed that there was less communication from the Parents during seventh grade, indicating fewer concerns on their part.  Hearing Decision at 9, ¶ 32; *Goodwin* at 629-31; *Wheeler-Abbott* at 732-35.  In September and October 2008, the Parents worked directly with SM's Spanish and language arts teachers to help him complete his homework because he frequently was not turning it in.  Hearing Decision at 9, ¶ 32; Record at 711-17.  In October, the

---

[5] I have corrected errors in the Hearing Officer's account of SM's seventh-grade report card.

Parents also asked school staff to provide SM additional support and keep an eye on him because he was showing a lot of sadness and depression at home.  Hearing Decision at 9, ¶ 32; Record at 717, 719.   In November, SM's Spanish teacher informed the Parents that, although SM's homework completion had improved, she remained concerned about his comprehension and ability to follow classroom instruction.  Hearing Decision at 9, ¶ 32; Record at 721-22.  In January 2009, SM's math/science and humanities teachers reported that he was dragging his feet, having trouble completing work unless given individual attention, and struggling to complete homework.  Hearing Decision at 9, ¶ 32; Record at 724, 726.[6]  The Parents reported that they believed that SM was completing his homework based on his own report.  *Id*.  Ms. Doe requested that she be informed of homework assignments so that she could work with SM on them.  *Id*.

38.    In February, SM's math/science teacher continued to express concern that he did not understand the material and was giving up easily.  Hearing Decision at 9, ¶ 32; Record at 727.  By the end of February, SM's humanities teacher reported to the Parents that he had been working hard on his writing, and his motivation had improved.  Hearing Decision at 9, ¶ 32; Record at 728-29.  Ms. Doe remained in contact with SM's teachers.  Hearing Decision at 9, ¶ 32; Record at 732-40.  By May, one teacher was reporting that SM's confidence and self-direction had slipped and that he had reverted to not knowing what to do or how to get started. Hearing Decision at 9, ¶ 32; Record at 738.  Although Ms. Goodwin was SM's case manager and believed that teachers kept her informed regarding him, she was not copied on most of the emails between the teachers and the Parents.  Hearing Decision at 9-10, ¶ 32; Record at 711-38.

39.    Michelle Raber, SM's seventh-grade math and science teacher, found that he was not as motivated as other students.  Hearing Decision at 10, ¶ 33; Testimony of Michelle Raber

---

[6] The Hearing Officer mistakenly gave the date as "January 2011."

("*Raber*") at 786.  SM received grades ranging from a B to a D+, and Ms. Raber noted that his work habits fluctuated, improving during the second trimester but declining during the third trimester after he received the laptop that had been designated a reward by the Parents.  Hearing Decision at 10, ¶ 33; *Raber* at 786-96; Record at 936.  Ms. Raber helped SM organize his notebook and found that, if she held his feet to the fire, he could complete his work.  Hearing Decision at 10, ¶ 33; *Raber* at 792.

40.    Beth Fenwick, SM's seventh-grade reading, English, and social studies teacher, taught him for nearly two hours every day.  Hearing Decision at 10, ¶ 34; Testimony of Beth Fenwick ("*Fenwick*") at 804.  SM responded well to individual attention from her and became dependent on her to get work completed.  Hearing Decision at 10, ¶ 34; *Fenwick* at 806-07.  She observed that he needed instructions to be broken into steps.  Hearing Decision at 10, ¶ 34; *Fenwick* at 811.

### E.  Eighth Grade, Greely Middle School, 2009-10

41.    Shortly after the start of SM's eighth-grade year in the fall of 2009, he began showing defiance and was unable to engage even when redirected by a teacher.  Hearing Decision at 10, ¶ 35; *Goodwin* at 631-32.  Mark Phillips, SM's language arts and reading teacher, offered to meet with him twice a week after school, which worked for a while but ended when scheduling difficulties arose.  Hearing Decision at 10, ¶ 35; Testimony of Mark Phillips ("*Phillips*") at 816-17, 820-21, 825-26.  The Parents believed that eighth grade was much worse for SM.  Hearing Decision at 10, ¶ 35; *Mr. Doe* at 115.  His maturity level increased, and he began to suspect that others felt he was stupid.  *Id*.  The family contracted with a tutor to work on SM's social skills.  *Id*.

16

42.     Shortly after the start of eighth grade, SM scored "partially proficient" in reading and "substantially below proficient" in math on New England Common Assessment Program ("NECAP") tests.  Hearing Decision at 10, ¶ 36; Record at 255-56.

43.     In the fall of 2009, SM joined the cross country team.  Hearing Decision at 10, ¶ 37; *Ms. Doe* at 568-69.  In early October, he became ineligible to compete because he was not handing in work in his language arts class.  Hearing Decision at 10, ¶ 37; *Ms. Doe* at 569-70. The Parents and Ms. Goodwin intervened and asked that he be allowed to stay on the team.  *Id.*; *Goodwin* at 682-85; Record at 1011-12.  Ms. Goodwin suggested to other school staff that SM's "aspregery [sic] qualities" made it surprising that he had joined the team at all, and argued that because he was "lost a lot" and missed homework, he should not be penalized by being removed from the team.  Hearing Decision at 10, ¶ 37; Record at 1011.[7]  Ms. Goodwin informed school staff that SM was "extremely spacey and floaty, and then when you confront him about this, he does get a little edgy and attitudeish" as his way of coping because all of his life, he was told he was "out of it."  Hearing Decision at 10-11, ¶ 37; Record at 1012.  One teacher noted that, although he had informed SM that he was likely to become ineligible if he did not complete assignments, SM seemed to have forgotten the conversation the following week.  Hearing Decision at 11, ¶ 37; Record at 1012.  SM was allowed to continue on the team.  Hearing Decision at 11, ¶ 37; *Ms. Doe* at 55; *Goodwin* at 685.

---

[7] Ms. Goodwin alluded to Asperger's Syndrome, which "is a clinically recognized pervasive developmental disability."  *Mr. I v. Maine Sch. Admin. Dist.* 55, 416 F. Supp.2d 147, 153 (D. Me. 2006), *aff'd sub nom. Mr. I. ex rel. L.I. v. Maine Sch. Admin. Dist. No. 55*, 480 F.3d 1 (1st Cir. 2007).  "Its symptoms include limited interests or an unusual preoccupation with a particular subject to the exclusion of other activities, repetitive routines or rituals, peculiarities in speech and language, the inability to interact successfully with peers, and problems with non-verbal communication."  *Id.* (citation and internal punctuation omitted).  "It is an autism spectrum disorder, one of a distinct group of neurological conditions characterized by a greater or lesser degree of impairment in language and communication skills, as well as repetitive or restrictive patterns of thought and behavior."  *Id.* (citation and internal quotation marks omitted).

17

44.     On October 14, 2009, SM's 504 team met and made no significant changes to his section 504 plan.  Hearing Decision at 11, ¶ 38; Record at 918.  The plan did provide, for the first time, that SM would stay after school two nights a week for extra help.  Record at 928.  Mr. Phillips made himself available two days a week, on Tuesdays and Fridays, for after-school support, but no longer met with SM on Fridays after ski season started because the family traveled to their camp at Sugarloaf to ski.  *Ms. Doe* at 596-98; *Phillips* at 825-26.

45.     In October and again in early November 2009, SM was disciplined at school for computer-related offenses in which he attempted to hack into school security systems.  Hearing Decision at 11, ¶ 39; Record at 297, 1012-13, 1045.

46.     On November 1, 2009, SM received his interim first-trimester grades, which increased the Parents' concern because he had failing grades in three courses, including reading. Hearing Decision at 11, ¶ 40; Record at 282-87, 1058; *Ms. Doe* at 56; *Mr. Doe* at 117-18.  Ms. Doe informed school staff that SM was reporting that he was bored and could not complete assignments.  Hearing Decision at 11, ¶ 40; Record at 1058.  Mr. Doe indicated that the Parents were frustrated and did not know where to turn for help for SM's feelings of being lost and his loss of self-confidence.  Hearing Decision at 11, ¶ 40; Record at 1061.  Mr. Doe questioned school staff as to whether SM should repeat eighth grade or be placed in special education and advised that SM's teachers should understand that, when they spoke, he heard only a portion of what was said due to his lack of attentional skills.  *Id*.

47.     On November 2, 2009, Ms. Doe sought Dr. Hunter's advice.  Hearing Decision at 11, ¶ 41; Record at 291.  Dr. Hunter advised the Parents that SM needed increased support. Hearing Decision at 11, ¶ 41; *Hunter* at 214.  On November 4, Ms. Goodwin reported to school

staff that SM was going into "overwhelmed mode," causing his ADHD to intensify and resulting in his "grasping very little of his education."  Hearing Decision at 11, ¶ 41; Record at 1066.

48.     On November 9, 2009, the family contracted with tutor Biz Houghton to work with SM once a week on the skills involved in executive functioning, processing, and organizing. Hearing Decision at 11, ¶ 41; *Ms. Doe* at 573.  That same day, Ms. Goodwin arranged for an educational technician to work with SM two periods a week during study halls.  Hearing Decision at 11, ¶ 41; Record at 1070.  On November 10, the family requested additional support for SM at school and formally sought a referral to special education.  Hearing Decision at 11, ¶ 41; Record at 922.

49.     An initial IEP meeting was held on December 2, 2009, during which SM's team discussed his academic progress and determined his testing needs.  Hearing Decision at 11, ¶ 42; Record at 916-17, 923.  The Parents consented to testing, although specific testing was not identified pending an evaluation with Dr. Hunter for which the Parents had arranged to pay. Hearing Decision at 11, ¶ 42; Record at 916, 918-19.  The family also agreed to continue to pay for Ms. Houghton to tutor SM in organizational skills.  Hearing Decision at 11, ¶ 42; Record at 916.

50.     Following the school holiday break, Ms. Goodwin observed that SM was more defiant and choosing not to engage.  Hearing Decision at 11, ¶ 43; Record at 1095; *Goodwin* at 695.  Ms. Goodwin and Dr. Hunter were concerned that SM was at risk for substance abuse. Hearing Decision at 11, ¶ 43; *Hunter* at 220; *Goodwin* at 696.

51.     On February 11, 2010, Ms. Doe spoke with Ms. Goodwin, who relayed to other school staff that SM had disclosed to Ms. Doe that he felt that his teachers were telling him that he was failing, that he did not understand much of the subject matter in his classes, and that he

was not getting enough help.  Hearing Decision at 12, ¶ 44; Record at 1134.  The Parents also informed Ms. Goodwin that SM was detached at home and never smiled anymore and that they were very concerned about his well-being.  Hearing Decision at 12, ¶ 44; Record at 1140.  SM's physical education teacher reported that she was very worried about SM based on his non-participation in class, noting that no matter what game was being played, SM put his hands in his pockets, stood still, and refused to engage.  Hearing Decision at 12, ¶ 44; Record at 1137.  She noted that SM would often let a ball hit him in the head and not try to catch or dodge it.  Record at 1137.  SM's social studies teacher reported that he was concerned about SM and had been unable to connect with him.  Hearing Decision at 12, ¶ 44; Record at 1138.  He noted that SM was disengaged, did low quality work, and was not energized even by hands-on activities.  *Id*. SM's math/science teacher reported that she had SM sit next to her and checked in on him often, but even so, SM worked only when prompted to do so and then, only for a minute or two at a time.  Hearing Decision at 12, ¶ 44; Record at 1142.

52.     In February 2010, school psychologist Peggy Bickford submitted an evaluation of SM.  Hearing Decision at 12, ¶ 45; Record at 880.  Ms. Bickford observed SM in several classes, and noted that he was disengaged, his contributions were minimal, he arrived to classes unprepared, and he produced significantly less work product than other students.  Hearing Decision at 12, ¶ 45; Record at 882.  In evaluations submitted to Ms. Bickford, SM's teachers rated him as demonstrating at-risk behaviors and adjustment challenges in the areas of attention, learning problems, social skills, study skills, and communication skills.  Hearing Decision at 12, ¶ 45; Record at 884.  They also noted that he was minimally engaged.  Hearing Decision at 12, ¶ 45; Record at 881.

53.     Ms. Bickford concluded that it was unclear why SM had not internalized a work ethic and did not have a desire to engage positively in the learning process.  Hearing Decision at 12, ¶ 45; Record at 885.  She observed that, over time, there had been inconsistencies in holding SM accountable for producing work and demonstrating proactive learning strategies.  *Id*.  She opined that he was consciously choosing not to engage, with few consequences.  *Id*.  She concluded that SM was at great risk for failure in high school without behavioral supports in place, and that until he was held accountable for his behavior, there likely would be little change.  *Id*.  She observed that his school adjustment did not appear to be remediated by the section 504 accommodations.  *Id*.

54.     Ms. Bickford recommended that SM receive direct instruction in organization, have tasks broken into steps, and receive support in starting and completing homework.  *Id*.  She also recommended a behavioral plan to be implemented with parent support that held the student accountable and had relevant consequences.  *Id*.  She suggested that SM be taught note-taking skills and be held accountable for taking notes during class.  *Id*.  She also suggested that SM's IEP team consider whether he required remediation in math skills and develop a positive support plan, to be reinforced by the Parents and teachers, for the completion of work.  *Id*.  She recommended that a decision be made promptly about his ninth-grade year to facilitate the development of a plan to transition him to high school.  Hearing Decision at 12, ¶ 46; Record at 886.  She concluded that SM should be required to demonstrate some commitment and effort before the Parents invested in a costly private school placement.  Hearing Decision at 12-13, ¶ 46; Record at 886.

55.     GMS special education teacher Carol Robinson also produced an academic achievement summary report for SM's IEP team.  Hearing Decision at 13, ¶ 47; Record at 887-

91.  Achievement testing revealed that SM's calculation, math fluency, writing fluency, and broad math skills were low or low average but that all of his other skills were average or above average.  Hearing Decision at 13, ¶ 47; Record at 888.  In a formal observation of SM, Ms. Robinson noted that he was sitting in the back corner of the room with his back to the teacher, was exempted from taking a quiz because he had not completed his work, and was working with an educational technician.  Hearing Decision at 13, ¶ 47; Record at 892.  She concluded that SM was somewhat disengaged from the classroom and that his physical location in the back of the room made it easy for him to disengage.  *Id.*  She made no recommendations.  Hearing Decision at 13, ¶ 47; Record at 891.

56.  In March 2010, Dr. Hunter issued her report of her reevaluation of SM.  Hearing Decision at 13, ¶ 48; Record at 893; *Hunter* at 228.  Dr. Hunter found that SM had a communication disorder, a significant degree of disengagement, significant obsessive interests, highly inflexible behaviors and traits, a tendency to decline during periods of transition, dysregulation of mood, a blunted affect, and anxiety.  Hearing Decision at 13, ¶ 48; *Hunter* at 228-30.  She found that he harbored revenge fantasies but did not understand what the outcomes would be if he took those actions.  Hearing Decision at 13, ¶ 48; *Hunter* at 233.

57.  Dr. Hunter's testing suggested that SM's memory skills were highly erratic, his intellectual potential within language domains was excellent, his executive mental functions showed significant weaknesses, and his pragmatic language and fluent conversational skills showed mild impairment.  Hearing Decision at 13, ¶ 49; Record at 903-04.  He also tested in the 1st percentile in math fluency.  Hearing Decision at 13, ¶ 49; Record at 901.

58.  Dr. Hunter concluded that SM had a puzzling diagnostic profile that was not easily captured in a discrete category but that he was best understood as being on the autism

spectrum and having Asperger's Syndrome.  Hearing Decision at 13, ¶ 50; Record at 904.  She concluded that he met the diagnostic criteria with respect to communication deficits, impairments of social perception, special interests, and problems with adaptive functioning, impacting his academic, behavioral, emotional, motor, and interpersonal functioning.  *Id*.

59.     Dr. Hunter found that SM needed a motivational environment, accommodation of core weaknesses of working memory and processing speed, and remediation of a learning disability in mathematics.  Hearing Decision at 13, ¶ 51; Record at 906.  She suggested modifying SM's environment, instruction, and curriculum, suggesting, for example, a modified school day with less work, more individualized instruction, and a smaller environment.  Hearing Decision at 13, ¶ 51; Record at 907.

60.     Dr. Hunter disagreed with the approach advocated by Dr. Bickford of holding SM accountable, believing that SM did not have the skills needed to be accountable.  Hearing Decision at 13, ¶ 52; *Hunter* at 226-27.  She advocated building a plan that identified SM's skill deficits as well as his psychological needs.  Hearing Decision at 13-14, ¶ 52; *Hunter* at 227.

61.     At the next IEP team meeting on March 5, 2010, SM was identified as eligible for special education under the category of multiple disabilities, listed as autism, other health impairment (ADHD), and a specific learning disability (in math).  Hearing Decision at 14, ¶ 53; Record at 854, 856.  Dr. Hunter advocated for brain-based interventions, with the hope of changing SM's behavior so that he would become more engaged in learning.  Hearing Decision at 14, ¶ 53; Record at 1023-24.

62.     SM's IEP called for specially designed instruction for nine blocks of 45 minutes each week, as well as social work services for one hour per month.  Hearing Decision at 14, ¶ 54; Record at 868.  The IEP contained goals related to organization and work completion, basic math

23

skills in multiplication and division, and social worker consultations with staff. Hearing Decision at 14, ¶ 54; Record at 865-67. The IEP indicated that a behavioral plan was not needed, but called for homework assignments to be written down for the Parents to see and for classroom expectations to be modified. Hearing Decision at 14, ¶ 54; Record at 863, 869. The written notice from the meeting also noted that SM would be withdrawn from Spanish, continue his weekly counseling sessions with Ms. Goodwin, and continue to receive all of the accommodations included in the section 504 plan. Hearing Decision at 14, ¶ 54; Record at 854.

63.     Although Dr. Hunter did not see the IEP at the time that it was developed, she testified, based on a later review, that it was not appropriate for SM. Hearing Decision at 14, ¶ 55; *Hunter* at 235-36. She testified that the instructional goals were not sufficiently specialized for SM and did not build upon his interests. Hearing Decision at 14, ¶ 55; *Hunter* at 236-44. She concluded that the IEP did not reflect the complexity of his needs. Hearing Decision at 14, ¶ 55; *Hunter* at 241-42.

64.     Also in March 2010, the Parents contracted with a private speech-language pathologist to provide SM with social cognition therapy. Hearing Decision at 14, ¶ 56; Record at 370. The pathologist met with SM three times, but the service was discontinued due to SM's lack of engagement. *Id*.

65.     In mid-April, Ms. Houghton reported that SM was not engaging and had "not caught on to the modeling of a system," likely because of his overall disinterest in school. Hearing Decision at 14, ¶ 57; Record at 379-80. The family stopped the tutoring service. Hearing Decision at 14, ¶ 57; *Ms. Doe* at 585.

66.     SM's IEP was modified in May 2010 to include a transition plan and a change in his case manager from Ms. Robinson at GMS to Cynthia Lasher at Greely High School ("Greely

High"). Hearing Decision at 14, ¶ 58; Record at 837, 848-50. The modification was forwarded to the Parents in June. Hearing Decision at 14, ¶ 58; Record at 837.

67.     Ms. Robinson, who was assigned as SM's special education teacher, worked with him four days a week, for an hour and a half per day, from March 2010, when he was identified as eligible for special education, to the end of his eighth grade school year. Hearing Decision at 14, ¶ 59; Testimony of Carol Robinson ("*Robinson*") at 850, 852, 876. She focused on math during their sessions and also helped him organize assignments. Hearing Decision at 14, ¶ 59; *Robinson* at 851. She did not undertake individualized lesson plans to teach SM organizational and executive functioning skills. Hearing Decision at 14, ¶ 59; *Robinson* at 884. Ms. Goodwin perceived that after SM began working with Ms. Robinson he had less difficulty with work refusal, and his work production improved. Hearing Decision at 14-15, ¶ 59; *Goodwin* at 635-36.

68.     As of June 2010, Ms. Robinson graded SM as partially meeting his annual goals of learning his multiplication facts and single- and multi-digit division terms, completing homework and classwork assignments, and obtaining grades of C or better. Hearing Decision at 15, ¶ 60; Record at 455-56.

69.     During the spring of 2010, the family explored alternative placements for ninth grade, including Casco Bay High School, Hebron Academy, and Waynflete Academy, as well as several out-of-state residential options. Hearing Decision at 15, ¶ 61; *Mr. Doe* at 483-84; *Ms. Doe* at 585-86, 593. The family also sought information about a program at Greely High called the Small Learning Community, a group of 60 students taught by three teachers in a team teaching model. Hearing Decision at 15, ¶ 61; *Ms. Doe* at 586-87; *Wheeler-Abbott* at 744. Ms. Goodwin informed the family that she did not have a clear understanding of how to get SM

selected for this small program.  Hearing Decision at 15, ¶ 61; Record at 411.  Ms. Wheeler-Abbott thought that the Small Learning Community would be good for SM.  Hearing Decision at 15, ¶ 61; *Wheeler-Abbott* at 744.

70.     By the beginning of June 2010, SM had either been rejected by, or did not seem a good fit for, all of the high schools that had been explored by the family except for Franklin Academy in Connecticut.  Hearing Decision at 15, ¶ 62; *Ms. Doe* at 585-89.[8]  On June 4, 2010, Ms. Doe requested information about the transition to Greely High, inquiring when the IEP team would meet to work on the transition and whether high school staff would be part of the transition plan.  Hearing Decision at 15, ¶ 62; Record at 1179.  When school staff sought to schedule an IEP team meeting in September, Ms. Doe requested that it be held earlier.  Hearing Decision at 15, ¶ 62; Record at 424-25.  Because many school staff were unavailable due to end of the school year activities, no IEP team meeting was scheduled, but Ms. Doe met on June 15, 2010, with a few staff members.  Hearing Decision at 15, ¶ 62; *Ms. Doe* at 590-93; *Goodwin* at 639-40.  The District would have held a transitional meeting just before or just after the start of the school year in the fall, once it knew who SM's case manager and guidance counselor would be.  Hearing Decision at 15, ¶ 62; *Goodwin* at 708.

71.     Ms. Doe, Ms. Goodwin, Ms. Lasher (who was expected to be SM's special education teacher/case manager in high school), and Ms. Robinson attended the June 15 staffing meeting.  Hearing Decision at 16, ¶ 65; *Ms. Doe* at 590-91.  School staff members were unable to answer Ms. Doe's questions as to whether SM would be placed in the Small Learning Community and who would be his special education teacher and social worker.  Hearing Decision at 16, ¶ 65; *Ms. Doe* at 591-92.  Staff members were not ready to answer those

---

[8] The Hearing Officer mistakenly referenced "June 2011."

questions because they were not yet prepared for SM's transition meeting, which would have happened in late summer or early fall. Hearing Decision at 16, ¶ 65; *Goodwin* at 640, 707-08. After the meeting, Ms. Goodwin reported to Ms. Wheeler-Abbott that the meeting was disorganized and that Ms. Lasher did not have a clear plan on how she was going to support SM. Hearing Decision at 16, ¶ 65; Record at 832.

72.     At Greely High, SM's social worker would have been Peter Scott, and his behavioral strategist would have been Nancy Dwyer. Hearing Decision at 16, ¶ 66; Testimony of Peter Scott ("*Scott*") at 912; Testimony of Ann Nunery ("*Nunery*") at 944-45. Ms. Robinson learned at some point near the end of the school year that she would be transferring to the high school the following year, meaning that she likely would have remained SM's special education teacher, but it is unclear when this information was conveyed to the Parents. Hearing Decision at 16, ¶ 66; *Ms. Doe* at 593; *Robinson* at 858-60.

73.     Just prior to the June 15 staffing meeting, the family submitted an application for SM to attend Eagle Hill School ("Eagle Hill"), a residential school in Hardwick, Massachusetts. Hearing Decision at 15-16, ¶ 65; *Ms. Doe* at 590; Record at 435-45.[9]

74.     The family did not think that the IEP, as amended on May 19, 2010, and sent to them on June 16, 2010, was sufficiently individualized to address SM's needs. Hearing Decision at 16, ¶ 67; *Mr. Doe* at 367-68; Record at 835. The Parents were concerned that SM was not learning to learn. Hearing Decision at 16, ¶ 67; *Mr. Doe* at 368. They were also concerned that SM would be pulled out of regular education 40 percent of the time, even though he learned best in a small, collaborative environment. Hearing Decision at 16, ¶ 67; *Mr. Doe* at 401-02. The Parents felt that the IEP did not tap into SM's motivations. *Id*. They were concerned that,

---

[9] The Hearing Officer mistakenly referred to Hardwick as "Heartwood."

although SM did not resist being placed in special education, he would resist being singled out and pulled out of classes.  Hearing Decision at 16, ¶ 67; *Mr. Doe* at 403.

75.     Dr. Hunter believed that, to succeed in high school, SM needed to get a grounded sense of himself as a student, be engaged at the level of shared ideas or concepts, be educated in a smaller setting in which educators would know him well, understand the complexity of his profile, and have the resources and ability to work through his multi-level needs.  Hearing Decision at 16, ¶ 67; *Hunter* at 249-50.

76.     The 2009-10 school year ended on June 21, 2010.  Hearing Decision at 16, ¶ 68; District's Brief at 30; Parents' Brief at 23.  SM received one B, one C+, and four Cs for his third trimester of eighth grade.  Hearing Decision at 15, ¶ 63; Record at 457.  Mr. Phillips, SM's eighth-grade language arts and reading teacher, observed that SM was very quiet, tended not to contribute to class conversation, and was reading at grade level.  Hearing Decision at 15, ¶ 64; *Phillips* at 819-20.  Mr. Phillips observed that SM sometimes struggled to get started when asked to write.  *Id*.  Mr. Phillips found that, when he did meet with SM individually, his presence alone helped SM accomplish his writing tasks.  Hearing Decision at 15, ¶ 64; *Phillips* at 820-21.  He observed an improvement in SM's work product once he was identified as eligible for special education and Ms. Robinson began to help him with work completion.  Hearing Decision at 15, ¶ 64; *Phillips* at 826-27.

77.     By letter dated June 23, 2010, Eagle Hill informed the family that SM had been accepted for admission.  Hearing Decision at 16, ¶ 69; Record at 463.  On June 25, 2010, the family forwarded a check in the amount of $36,181 to Eagle Hill, representing a $7,500 deposit, $24,811 for one-half of the total tuition due for the 2010-11 school year, and $3,800 for a student account.  Hearing Decision at 16, ¶ 69; Record at 467.  The family on that date also signed a

contract indicating that enrollment could be withdrawn without further obligation only through June 1, 2010, and that "[a]cceptance of enrollment constitutes an agreement to pay the full academic year's charges[.]"  Record at 473-74.  The Parents indicated, in a letter accompanying the check, that enrollment forms would be faxed the following Monday.  Hearing Decision at 16, ¶ 69; Record at 467.  Eagle Hill considered SM to be enrolled for the 2010-11 school year as of July 1, 2010.  Record at 474, 477.

78.     By letter dated August 13, 2010, the Parents informed the District that they were placing SM at Eagle Hill for his ninth-grade year.  Hearing Decision at 17, ¶ 70; Record at 478.  They stated that they believed that SM required special education long before he was identified as eligible in March 2010 and that the IEP to be implemented at Greely High was not appropriate to address his special academic and functional needs.  *Id.*

79.     In late August 2010, several school staff members met to devise a behavioral plan for SM.  Hearing Decision at 17, ¶ 71; *Wheeler-Abbott* at 746-47.  The revised IEP included a draft behavioral plan that used "Malone Money" rewards to incentivize SM.  Hearing Decision at 17, ¶ 71; Record at 793-94.  The plan was developed without SM, although school staff anticipated that it would be revised once his input was obtained.  Hearing Decision at 17, ¶ 71; *Wheeler-Abbott* at 747-48.  A behavioral goal was added to the IEP along with the behavioral plan, SM's social work goal was revised, and the IEP was forwarded to the family on August 27, 2010.  Hearing Decision at 17, ¶ 71; Record at 829.  Mr. Doe did not believe that the Malone Money reward system would work because it was too juvenile and did not play to SM's interests.  Hearing Decision at 17, ¶ 71; *Mr. Doe* at 396-97.

80.     Although SM was not returning to the District, an IEP team meeting was held on September 16, 2010, and further changes were made to his IEP.  Hearing Decision at 17, ¶ 72;

Record at 795-97.  At the meeting, the Parents expressed concern that school staff had not taken the time to get to know SM and understand his interests, that SM would not buy into the behavioral plan as developed, and that the transition to Greely High was not sufficiently supportive.  Hearing Decision at 17, ¶ 72; Record at 796.  The Parents agreed that, if SM returned to the District, he would participate in the modification of the behavior plan.  *Id*.  The revised IEP, sent to the family on September 22, 2010, reflected the longer blocks in the high school class schedule and contained modifications to SM's social work and behavioral goals. Hearing Decision at 17, ¶ 72; Record at 811, 813, 815, 817, 819.

### F.   Ninth Grade, Eagle Hill School, 2010-11

81.     SM attended ninth grade at Eagle Hill.  Hearing Decision at 17, ¶ 73; *Ms. Doe* at 594-95.  All of the students at Eagle Hill have been diagnosed with a learning disability, including executive functioning disorders and ADHD.  Hearing Decision at 17, ¶ 73; Testimony of Sara Kaplan ("*Kaplan*") at 412.  SM's day at Eagle Hill was structured, beginning at 6:45 a.m. and ending at 8:00 p.m.  Hearing Decision at 17, ¶ 73; *Kaplan* at 413-14.  Academic classes at Eagle Hill have a maximum of eight students, allowing instructors to work individually with students.  Hearing Decision at 17, ¶ 73; *Kaplan* at 414.  Each dorm floor has a dorm counselor and, during study halls, dorm counselors and teachers are present on the dorm floors.  Hearing Decision at 17, ¶ 73; *Kaplan* at 415, 448-50.  The staff at Eagle Hill seek to form bonds with the students, take into consideration their strengths and weaknesses, and encourage productivity. Hearing Decision at 17, ¶ 73; *Kaplan* at 416.

82.     Sara Kaplan was SM's ninth-grade academic advisor at Eagle Hill.   Hearing Decision at 17, ¶ 73; *Kaplan* at 411-12.  Her role was to devise his academic schedule, provide

academic and personal support, and maintain contact with his parents.  Hearing Decision at 17-18, ¶ 73; *Kaplan* at 411-12.

83.    At Eagle Hill, the school year is divided into nine terms of 21 days each.  Hearing Decision at 18, ¶ 74; *Kaplan* at 417.  SM was required to take core classes but was able to select various electives.  *Id*.  Ms. Kaplan drafted his IEP based on his prior educational records. Hearing Decision at 18, ¶ 74; *Kaplan* at 423-24.  The IEP was designed to give teachers ideas to draw upon.  Hearing Decision at 18, ¶ 74; *Kaplan* at 424.  Eagle Hill incorporates a set of accommodations into expectations for all students.  *Id*.

84.    SM quickly earned the privilege of self-study, meaning that he did not need to have a proctor check off that his homework was completed, because Kaplan gauged that he was able to do his work independently on a consistent basis.  Hearing Decision at 18, ¶ 75; *Kaplan* at 424, 450.  Shortly after his arrival at Eagle Hill, SM took a TerraNova test that showed high mastery in reading and moderate mastery in all language and mathematics objectives.  Hearing Decision at 18, ¶ 75; Record at 524.

85.    SM seemed happy at Eagle Hill until March 2011, when he became melancholy after a close friend left the school.  Hearing Decision at 18, ¶ 76; *Mr. Doe* at 377.  When SM came home that month, he reported that he had been punched in the leg by another student. Hearing Decision at 18, ¶ 76; *Mr. Doe* at 380-81.  The Parents relayed this to Ron Baglio, Eagle Hill's assistant headmaster for student life, who persuaded them that, to deal with the situation effectively, he needed to address it directly with the other student.  *Mr. Doe* at 381-82; *see also* Record at 659.

86.    The student surmised that SM was the one who had reported him, and upon SM's return from break, "the dorm was exploding with calling [SM] a rat."  *Mr. Doe* at 382.  The

Parents persuaded a tearful SM to finish the week at school and then brought him home, where he remained for a week. *Id*. at 382-84. Upon returning home, SM kept repeating, "I can't go back to that school. . . . I can't do it. . . . I will do anything not to have to go back" and later "began to shake uncontrollably and became physically sick." Record at 674. Dr. Hunter met with SM while he was home and concluded that he was suffering from situational depression due to his conflict with the other Eagle Hill student. Hearing Decision at 18, ¶ 76; *Hunter* at 255-57.

87.      While SM was away, Ms. Kaplan remained in contact with him to assure him that his return would be handled well. Hearing Decision at 18, ¶ 76; *Kaplan* at 433. During that time, Mr. Baglio met with the other student and his parents, warning that any further badgering by the student or his friends would result in their eviction from school, and Mr. Baglio and Ms. Kaplan planned SM's reentry, including arranging for the services of a handpicked counselor for SM. *Mr. Doe* at 383-84, 388. Even the Eagle Hill headmaster became involved. *Id*. at 388. SM returned to Eagle Hill, after which Ms. Kaplan checked in with him regularly and concluded that he was doing well, seemed happy, and was participating in his classes. Hearing Decision at 18, ¶ 76; *Kaplan* at 433-34. SM was able to return to school, befriend the peer in question, join the school's tennis team, and enjoy a strong finish to the year. Record at 689; *Mr. Doe* at 385-86, 389-91; *Kaplan* at 433-36.

88.      At the end of the school year, SM was nominated for an English department award for writing. *Ms. Doe* at 394. Ms. Kaplan was impressed with his trajectory over the year and believed that the tight structure had helped him maintain a sense of routine and that the academic and social support was critical to his success. *Kaplan* at 436-37. SM earned all As and B s during his year at Eagle Hill and was on the honor roll after his return to Eagle Hill. Hearing Decision at 18, ¶ 76; Record at 606; *Kaplan* at 438. Ms. Doe believed that SM experienced

amazing growth at Eagle Hill and came to believe in himself in a way that he did not while at GMS.  Hearing Decision at 18, ¶ 76; *Ms. Doe* at 595-96.  Dr. Hunter felt that the placement met SM's needs because it offered a smaller class size, a program driven by relationships, and a specialized knowledge of teenagers and Asperger's Syndrome.  Hearing Decision at 18, ¶ 76; *Hunter* at 348-49.

89.     The Parents spent $66,111.92 in tuition and related expenses for SM to attend Eagle Hill for the 2010-11 school year.  Hearing Decision at 19, ¶ 77; Record at 608.  This consisted of $57,262 for tuition, $3,800 for a student fee account, $570 for counseling, $996.70 for school uniforms, $1,226.75 in travel expenses, $382.50 for an educational consultant, $600 for psychological testing and session fees, and $1,273.97 for lodging expenses.  *Id.*

90.     On August 8, 2011, SM wrote a letter explaining that he felt that his sixth grade teachers were angry that he was not performing at the level of other students and that they wondered why he could not do so.  Hearing Decision at 19, ¶ 78; Record at 609.  He noted that in seventh grade his family sought assistance and support, but he felt that he had received only a lightened workload and occasional assistance with his classes.  *Id.*  He stated that eighth grade consisted of a back and forth fight to gain help for him, that he found little meaning in what was being taught, and that he had just about given up in his classes.  *Id.*  He wrote that, at Eagle Hill, things changed for him, he gained perspective on academics, he learned that he had a talent for writing, and he did well in his classes.  *Id.*  He concluded that he felt that he had learned exactly what he needed to succeed as a learner with his disabilities.  *Id.*

91.     SM's uncle observed that SM seemed to grow increasingly distant and less apt to smile during his three years at GMS.  Hearing Decision at 20, ¶ 82; Testimony of [JM] ("*JM*") at 487-88.  He testified that during SM's year at Eagle Hill, SM became more animated, made more

eye contact, and seemed like his old self.  Hearing Decision at 20, ¶ 82; *JM* at 490.  SM reported to his uncle that he liked school and had fun at Eagle Hill.  *Id.*  SM's grandmother testified that SM withdrew gradually and became more difficult to communicate with during his three years at middle school.  Hearing Decision at 20, ¶ 82; Testimony of [HM] ("*HM*") at 497-99.  She also observed that SM seemed in slightly more positive spirits when he returned home from Eagle Hill during breaks and was more engaging during the summer after his ninth-grade year. Hearing Decision at 20, ¶ 82; *HM* at 500.

92.     In September 2011, Dr. Hunter had a session with SM during which he appeared more attentive to his grooming, pulled together, and articulate about his experiences at Eagle Hill.  Hearing Decision at 19, ¶ 79; *Hunter* at 263.  SM also began to engage in therapy services more than he had in the past.  Hearing Decision at 19, ¶ 79; *Hunter* at 264.

### G.  Tenth Grade, Brewster Academy, 2011-12

93.     The District proposed an IEP for the 2011-12 school year, SM's tenth grade year, that included annual goals in organization, time management, and study skills; basic math skills; interpersonal skills with peers and adults; behavior related to preparedness for class, participation in class, and completion of assignments; and social work, including attending and participating in appointments, improving his understanding of others, improving his self-awareness, and increasing his comfort with a range of emotions.  Hearing Decision at 19, ¶ 80; Record at 750, 756-60.  The IEP called for specially designed academic instruction six times per four-day rotation for 55 minutes each, specially designed behavioral instruction weekly for 55 minutes, social work services weekly for 55 minutes, consultation by the special education teacher and social worker for a total of 45 minutes per month, coaching 15 minutes before and 15 minutes after school each day, and tutorial services as needed.  Hearing Decision at 19, ¶ 80; Record at

762.   The IEP also included a series of accommodations for SM, including writing down his assignments, modifying classroom expectations, providing him with visual and tactile opportunities to demonstrate his understanding, preferential seating, and frequent check-ins. Hearing Decision at 19, ¶ 80; Record at 763.[10]

94.     Dr. Hunter did not believe that the final IEP offered to SM for his tenth-grade year was appropriate or sufficiently individualized to meet his needs.  Hearing Decision at 19, ¶ 81; *Hunter* at 265-66.  She believed that the behavioral plan would not have been effective because SM does not have a typical understanding of cause and effect, standard motivations did not engage him, and the plan required SM to take initiative.  *Id*.  She testified that SM's behavioral plan needed to compensate for the fact that he did not initiate or sustain actions.  *Id*.

95.     SM attended Brewster Academy ("Brewster") in New Hampshire as a residential student for his tenth-grade year.  Hearing Decision at 20, ¶ 83; *Mr. Doe* at 386-87; John Doe Decl. ¶ 2.  During his year at Brewster, SM's biggest overriding issue was addressing his deep deficits in executive functioning skills.  John Doe Decl. ¶ 3.  His needs in this area included skills as basic as getting himself to bed at night and getting himself out of bed in the morning to make his classes on time.  *Id*.  In Mr. Doe's view, SM has the academic ability to master complicated subjects and concepts, but it became clear at Brewster that he requires constant follow-up and monitoring of his progress conducted by someone with whom he can build a strong rapport.  *Id*.  In short, Mr. Doe found, SM needed a personal coach/mentor acting in the capacity of an advisor to have meaningful access to the curriculum at Brewster.  *Id*.

---

[10] The 2011-12 IEP was developed in the wake of the Parents' filing on June 24, 2011, of a request for a due process hearing that made clear that SM would not be returning to public school for the 2011-12 school year.  Record at 1-8. In response to the hearing request, the District scheduled and held a resolution session meeting on July 6, 2011, during which it proposed its 2011-12 IEP, which the family rejected.  *Id*. at 747-49; *Robinson* at 866-69.

96.     After SM's successful year at Eagle Hill, he wanted to try a more mainstream school for his sophomore year of high school.  *Id*. ¶ 4.  This led the family to Brewster, which had denied SM admission the prior year because of the extent of his special needs.  *Id*.  Brewster admitted SM for 2011-12 based on his progress at Eagle Hill but only on the condition that the family enroll him in its specialized program, called Instructional Support ("IS"), at an additional cost of approximately $10,000.  *Id*.  Brewster provided SM with IS services three times per week, but even that proved insufficient, in Mr. Doe's view, to give SM the guidance and mentoring that he required to negotiate the Brewster curriculum.  *Id*.  It became apparent to Mr. Doe that SM required daily advising and mentoring to have a chance at success.  *Id*.  During those daily sessions, SM's advisor needed to review each subject and all assignments with SM to make sure that he comprehended each assignment and completed it in a manner reflective of his ability.  *Id*.  In addition, the advisor needed to communicate with each of SM's teachers at least weekly to ensure that he was properly understanding his assignments and responsibilities and not becoming distracted during class time.  *Id*.

97.     In Mr. Doe's view, SM demonstrated at Brewster that, with the right guidance, he could complete all of the work assigned in his classes without having it "dumbed down."  *Id*. ¶ 5.  One of the most important accommodations was to have the ability to make up past-due assignments with the assistance of his advisor, tutor, and/or teacher without suffering a grade penalty.  *Id*.  Once Brewster recognized SM's executive functioning lapses and stopped penalizing him for late work, his grades increased significantly.  *Id*.

98.     In Mr. Doe's view, SM also should be allowed to take fewer courses than a normal course load, which he did at Brewster by dropping one course near the end of his first term, and/or take "for credit" courses either online or through external tutoring services, one-on-

one, as needed.  *Id*.  In certain subjects, such as math, SM's comprehension increases markedly if he is taught one-on-one *versus* in a classroom environment.  *Id*.  This is especially important whenever his coursework may be particularly challenging.  *Id*.

99.    SM also continued to demonstrate significant social and psychological needs at Brewster.  *Id*. ¶ 6.  Based on this experience, Mr. Doe concluded that SM needs to be heavily encouraged to engage in in-school and community events, with an emphasis on the strengths that he can share with the community.  *Id*.  For example, at Brewster, SM had an internship in the Information Technology department that allowed him to interact with the student body while engaging his strength in computers through work at the IT Help Desk on campus.  *Id*.

100.    A major new challenge for SM at Brewster was his "coming out" publicly and letting other students know that he is gay, resulting in SM dealing with emotions of which he was not yet fully aware.  *Id*. ¶ 7.  Brewster engaged psychologists on a weekly basis toward the end of the year to help SM with these issues and emotions.  *Id*.  These additional services helped SM gain the perspective needed as a young man with the social awkwardness of an "Aspergery" teenager while also addressing the social isolation that comes with being a gay high school student.  *Id*.  Such counseling work, in Mr. Doe's view, will be required if SM is to receive an appropriate education moving forward, especially given his well-documented history of having challenges with transitions.  *Id*.

### II.  Proposed Conclusions of Law

1.    The Hearing Officer rendered her Limitations and Hearing decisions pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*., and its Maine counterpart, 20-A M.R.S.A. § 7001 *et seq*., and accompanying regulations, *see*

Limitations Decision at 6-7; Hearing Decision at 1, presiding over five days of hearings during which 14 witnesses testified, *see* Record at 1503, 1571, 1656, 1734, 1820.

2.      A party dissatisfied with the decision of an MDOE hearing officer may appeal that decision to the Maine Superior Court or to the United States District Court.  20-A M.R.S.A. § 7207-B(2)(B); *see also* 20 U.S.C. § 1415(i)(2)(A).

3.      The IDEA provides that a court reviewing the decision of a hearing officer "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

4.      "The role of the district court is to render bounded, independent decisions – bounded by the administrative record and additional evidence, and independent by virtue of being based on a preponderance of the evidence before the court."  *Hampton Sch. Dist. v. Dobrowolski*, 976 F.2d 48, 52 (1st Cir. 1992) (citation and internal quotation marks omitted). "While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such findings is ultimately left to the discretion of the trial court."  *Id*. (citations and internal quotation marks omitted).

5.      The First Circuit and other courts have suggested that with respect to a hearing officer's legal conclusions, the level of deference due depends on whether the court is equally well-suited to make the determination despite its lack of educational expertise.  *See, e.g., Deal v. Hamilton Cnty. Bd. of Educ*., 392 F.3d 840, 849 (6th Cir. 2004) ("Less weight is due to an agency's determinations on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation.  More weight, however, is due to an

agency's determinations on matters for which educational expertise is relevant.") (citations and internal quotation marks omitted); *Abrahamson v. Hershman*, 701 F.2d 223, 231 (1st Cir. 1983) (noting that while it might be "inappropriate for a district court under the rubric of statutory construction to impose a particular educational methodology upon a state[,]" court was free to construe term "educational" in IDEA "so as to insure, at least, that the state IEP provides the hope of educational benefit.").  Even as to findings of fact, the court retains the discretion, after careful consideration, "to accept or reject the findings in part or in whole."  *Town of Burlington v. Department of Educ.*, 736 F.2d 773, 792 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985).

6.      In IDEA cases, as in other contexts, the burden of persuasion rests on the party seeking relief.  *See, e.g., Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 51 (2005); *Dobrowolski*, 976 F.2d at 54; *Maine Sch. Admin. Dist. No. 35 v. Mr. and Mrs. R*., 176 F. Supp.2d 15, 23 (D. Me. 2001) (rec. dec., *aff'd* Feb. 27, 2002), *rev'd on other grounds*, 321 F.3d 9 (1st Cir. 2003) ("The party allegedly aggrieved must carry the burden of proving . . . that the hearing officer's award was contrary to law or without factual support.").

7.      The District challenges the Hearing Officer's reimbursement award on three fronts: that she erroneously (i) applied an exception to the operative two-year statute of limitations, (ii) found a violation by the District of its child-find and referral duties during SM's sixth and seventh grade years, and (iii) granted an improper remedy.  *See* District's Brief at 7. The Parents challenge the Hearing Officer's ruling that the District offered SM a FAPE for the 2011-12 school year.  *See* Parents' Brief at 28-34.

## A.  District's Appeal

### i.  Statute of Limitations

8.      The IDEA provides, in relevant part:

(C)  Timeline for requesting hearing

A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

(D)  Exceptions to the timeline

The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to –

(i)     specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

(ii)    the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

20 U.S.C. § 1415(f)(3)(C)-(D).  Maine special education regulations mirror this provision.  *See*

Maine Unified Special Education Regulation, Code Me. R. 05-071 ch. 101 (2012) ("MUSER"),

§ XVI.13.E-F.

9.     During proceedings before the Hearing Officer, the District raised a statute of

limitations defense, seeking to bar consideration of the Parents' claims based on violations of the

IDEA occurring prior to June 24, 2009, two years prior to the date on which the Parents filed a

due process complaint with the MDOE.  *See* Record at 107.  The Parents countered that they met

the requisites of the second, or "withholding," exception to the application of the statute of

limitations and, alternatively, that (i) Maine had not legally adopted the federal limitations

provisions, (ii) even if Maine did adopt them, the Parents filed their claim within two years of

when they knew or should have known that they had a claim that could be pursued in due

process, and, (iii) in any event, the Hearing Officer could consider violations occurring prior to

June 2009 on the basis that they were part of a chain of "continuing violations."  *See id*. at 107-

121.

10.    On August 16, 2011, the Hearing Officer took testimony related to the statute of limitations defense.  *See* Limitations Decision at 1.  By decision dated September 1, 2011, she ruled that the triggering event, for purposes of the application of the statute, was the Parents' knowledge of the action that created the alleged injury to SM rather than their understanding of the potential liability of the District, and that they should have known by October 2007 that the decision not to place SM in special education could be injurious.  *See id.* at 10-11.  However, she agreed with the Parents that the withholding exception applied, permitting them to raise claims dating back to September 2007.  *See id.* at 13-17.  She did not reach the Parents' remaining two arguments.  *See id.* at 17-18.

11.    On November 17, 2011, the District sought reconsideration of the statute of limitations ruling based on new guidance from the MDOE.  *See* Record at 1473-75.  On November 21, 2011, the Parents filed a response in opposition to the motion.  *See id.* at 1478-79.  The Hearing Officer then denied the motion on the basis that she did not have jurisdiction to reopen a final hearing decision.  *See id.* at 1477.

12.    The District appeals the Hearing Officer's rejection of its statute of limitations defense on the bases that (i) the word "withholding" connotes some level of intentionality, and the District never intentionally withheld anything from the family, and, (ii) in any event, the District's failure to provide procedural safeguards did not prevent the Parents from accessing due process.  *See* District's Brief at 10-17.  With respect to the latter point, the District argues that (i) the Parents had received safeguards in the past and, therefore, should be imputed knowledge of their due process rights, (ii) the Parents did not appear dissatisfied with the decisions made at the time and, therefore, apparently would not have challenged them, and (iii) the procedural safeguards do not address the point that is now asserted as an IDEA violation.  *See id.* at 15.

13.     The Parents bore the burden of proving the applicability of the withholding exception.  *See* Limitations Decision at 11; *J.L. ex rel. J.L. v. Ambridge Area Sch. Dist.*, No. 06-cv-1652, 2008 WL 2798306, at *10 (W.D. Pa. July 18, 2008).  The District, as the party seeking relief from this portion of the Hearing Decision, bears the burden of persuasion that the Hearing Officer's decision was wrong.  *See, e.g., Schaffer,* 546 U.S. at 51.

### a.  Whether "Withholding" Must Be Intentional

14.     As a threshold matter, the Hearing Officer rejected the District's argument that the withholding exception requires intentionality, reasoning that the sole case cited in support of that proposition, *Evan H. ex rel. Kosta H. v. Unionville-Chadds Ford Sch. Dist.*, Civil Action No. 07-4990, 2008 WL 4791634 (E.D. Pa. Nov. 4, 2008), cannot fairly be read to support it.  *See* Limitations Decision at 13.  The Hearing Officer was right.  While the *Evan H.* court observed, in dictum, that the Pennsylvania Special Education Appeals Panel had indicated that "the majority view is that the alleged misrepresentation or withholding of information must be intentional or flagrant[,]" the *Evan H.* court held only that "a misrepresentation must be intentional in order to satisfy the first of the exceptions[,]" namely, the "misrepresentation" exception.  *Evan H.*, 2008 WL 4791634, at *6 (citation and internal quotation marks omitted).

15.     On appeal, the District continues to rely on *Evan H.* as well as on an Oxford Dictionary definition of the word "withhold" as meaning, "Refuse to give (something that is due or desired by another)."  District's Brief at 11 (internal quotation marks omitted).  My own research indicates that the online Oxford English Dictionary defines "withhold," in relevant part, as "To keep back; to keep in one's possession (what belongs to, is due to, or is desired by another); to refrain from giving, granting, or allowing."  By this definition, one need not necessarily *know* that something is due to another; one need only keep back something in his (or

its) possession that is due to another.   "Given its broad educational objectives and specific

prescriptions, the IDEA should be liberally applied and construed in favor of meeting its goals of

providing appropriate and effective education to children with disabilities."   *Diatta v. District of

*Columbia*, 319 F. Supp.S2d 57, 62 (D.D.C. 2004).   Accordingly, the Hearing Officer properly

construed the phrase "withholding."   Hence, what matters is whether the District failed to

provide the Parents required safeguards, not whether, as it argues, any failure to do so was based

upon its good-faith, reasonable interpretation of less than clear law.   *See* District's Brief at 11;

District's Reply Memorandum of Law ("District's Reply") (ECF No. 23) at 3-7.

### b.  Whether Required Documents Were Withheld

16.     The Hearing Officer next considered "the key question": whether the District was,

in fact, required to provide safeguards.   *See* Limitations Decision at 14.   The Parents argued that,

even though SM transferred from a private school into the District and his Portland School

District IEP expired in May 2007, he remained IDEA-eligible.   *See id*. at 11-12.   Therefore, they

reasoned that the District was obliged to call an IEP team meeting and either devise a new IEP

for SM or terminate his special education eligibility.   *See id*.   They contended that the District

effectively de-identified SM as IDEA-eligible by informing them that he would have to be re-

referred for evaluation to receive special education services.   *See id*.   In so doing, they noted, the

District provided none of the IDEA procedures that would have protected the family's legal

rights in the circumstances.   *See id*.   The District contended that the law is unclear as to the

treatment of a student who transfers into a public school from a private one and whose public

school IEP has expired.   *See id*. at 13.   It pointed out that regulations addressing the question,

found at MUSER § IX.3.A(5), pertain to students who transfer from one public school to another

and have an IEP that was in effect at the previous public school.   *See id*.

17.    The Hearing Officer first found that, although it was clear that the District was not required to implement the Portland IEP, both because it had expired and because SM had transferred over the summer, it was also clear that, if SM remained IDEA-eligible, he was entitled to an IEP at the start of the school year following his enrollment in the District in the summer of 2007.  *See id*. at 14.  On appeal, the District does not dispute these propositions.  *See* District's Brief at 10-15.

18.    The Hearing Officer next held that SM remained IDEA-eligible.  *See* Limitations Decision at 14-16.  She acknowledged that neither the IDEA nor Maine regulations specify how long a determination of eligibility lasts and whether it transfers from one school district to another within a state when a student transfers and his or her IEP has expired.  *See id*. at 15.  However, she noted that:

A.    Even during his time in private school, SM retained some IDEA rights.  *See id*. at 14.  School districts are responsible for children with disabilities who are placed in private schools by their parents to the extent that schools must locate, identify, and evaluate all children with disabilities who are enrolled by their parents in private schools within the school district and develop and implement a service plan for each IDEA-eligible student that describes the specific special education and related services the school will provide.  *See id*. at 14-15 (citing MUSER § IV.4.G(1)(b) & (h)).  Although a school district is not required to pay for the cost of education, including special education and related services, for a student enrolled in private school if the school district made a FAPE available to the student, Maine regulations envision public schools providing special education services to students parentally placed in private schools.  *See id*. at 15 (citing MUSER §§ IV.4.G(3)(a), X.2.C(2)(h)).

B.      Once a student is identified as IDEA-eligible, special education provisions require a reevaluation to occur not more frequently than once a year, unless the parents and the school district agree otherwise, but at least every three years. *See id*. (citing 20 U.S.C. § 1414(a)(2)(B); MUSER § V.1.B(2)).

C.      Caselaw provides some additional insight. *See id*.  In *L.G. ex rel. E.G. v. Wissahickon Sch. Dist*., Civil Action Nos. 06-0333, 06-3816, 2011 WL 13572 (E.D. Pa. Jan. 4, 2011), a district court held that, when a student was offered an IEP in April 2004, the parents rejected the IEP offer and enrolled the student in a private school for the 2004-05 school year, and the student returned to the school district for the 2005-06 school year, the school district was obligated to develop a new IEP for the student. *See id*.; *Wissahickon*, 2011 WL 13572, at *10-*11.   The *Wissahickon* court noted that, "because IDEA requires that a public school district make a FAPE available to all disabled students residing within the district, school districts must be prepared to develop an IEP and to provide FAPE to a private school child if the child's parents re-enroll the child in public school."   Limitations Decision at 15 (quoting *Wissahickon*, 2011 WL 13572, at *11) (citation and internal quotation marks omitted).  *Wissahickon* shows that a student can retain eligibility in public school after returning from a year of attendance at private school. *See id*.

D.      In a 1996 Letter to Anonymous, the Office of Special Education Programs ("OSEP") advised that a student retains eligibility after transferring from another school district in which he or she had been identified as eligible for special education, even if the prior IEP is not available or the new school feels that the prior IEP is inappropriate. *See id*. (citing Letter to Anonymous, 25 IDELR at 527).

19.     The Hearing Officer ruled that SM retained his IDEA-eligibility in the fall of 2007, reasoning that his March 2006 eligibility determination did not require reevaluation until March 2009, his IEP did not expire until May 2007, just three months prior to his enrollment in the District, the District was aware that during the interim year in private school, he had received significant tutoring and exhibited difficulty with academics, he was struggling shortly after entering sixth grade, as noted by several of his teachers and the Parents, and the Parents sought additional support for him. *See id.*  She found that the fall 2007 "staffing" meeting during which SM was granted section 504 accommodations in effect functioned as an IEP team meeting held without essential team members and without following prescribed protocol, which mandated that the Parents receive (i) an advance notice of the team meeting and, (ii) if SM's special education eligibility was to be changed, a written determination of that change and a notice of procedural safeguards should they wish to challenge that determination. *See id.* at 16.  They did not receive the notice or safeguards. *See id.*

20.     On appeal, the District argues that relevant rules do not establish that SM remained an eligible special education student at the time of his transfer, given that (i) state and federal regulations establish that a currently eligible child with an IEP remains eligible upon his or her transfer from one public school to another, *see* District's Brief at 12 (citing 34 C.F.R. § 300.323(e); MUSER § IX.3.B(5)(a)(i)), (ii) the IDEA and federal and state regulations do not address the status of a child who was once eligible for special education and was placed in a private school unilaterally by his or her parents and whose IEP expired during that time, *see id.*, (iii) state and federal law clearly differentiate between public school students and private school students regarding their special education status and rights; for example, private school students do not have a right to a FAPE, a right to an IEP, or a right to access due process when unhappy

with any services they may or may not receive, *see id.* (citing 34 C.F.R. §§ 300.137(a), 300.140(a); MUSER § IV.4.G(1)), and (iv) Maine rules impose a duty on a new district to give effect to an IEP from a previous school district only "if a child with a disability (who had an IEP that was in effect in a previous SAU [school administrative unit] in the same State) transfers to a new SAU in the same State[,]" *id.* at 13 (quoting MUSER § IX.3.B(5)).

21.    Finally, the District points out that, in a November 17, 2011, answer to the frequently asked question, "What is the obligation of a SAU to provide services at the beginning of the school year to a child with an IEP who transfers to the SAU during the summer months[,]" the Maine Commissioner of Education stated, "The [M]DOE interprets MUSER §§ IX.3.B(3) and IX.3.B(5)(a) to require that, so long as the child comes to the SAU with a current (non-expired) IEP, the SAU must provide a FAPE to the child through provision of services comparable to those described in the IEP from the previous SAU until the child's IEP Team meets and determines to either adopt the IEP or develop a new IEP." *Id.*

22.    The District contends that the Hearing Officer read into the law a duty not included therein, violating the requirement that legislation enacted pursuant to the Spending Clause, which includes the IDEA, set forth a "clear statement" of agencies' duties. *See* District's Brief at 14; *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006) (IDEA is a Spending Clause law requiring a clear statement of duties). It argues that the Hearing Officer's strained interpretation should not form the predicate for a $66,000 financial penalty. *See* District's Brief at 14.

23.    The Hearing Officer correctly found that SM remained an IDEA-eligible student upon his transfer to the District in the fall of 2007. Once a child is identified as IDEA-eligible, a reevaluation of his eligibility need not occur for a period of as long as three years – even longer

if the local educational agency and the parents agree that reevaluation is unnecessary.  *See* 20 U.S.C. § 1414(a)(2)(B).  Unless the eligibility of a child with a disability is terminated because he or she has graduated from secondary school with a regular diploma or has exceeded the age eligibility for a FAPE under state law, a local educational agency *must* evaluate that child before determining that he or she is no longer a child with a disability.  *See id*. § 1414(c)(5).  No exception is made for children who transfer from a private school to a public school or whose IEP has expired.  *See id*.  For purposes of the Spending Clause, this constitutes a clear statement of the imposition of the duty at issue.  *See Murphy*, 548 U.S. at 296.

24.  Beyond this, as the Hearing Officer noted, *see* Limitations Decision at 14, guidance from the OSEP also indicates that the eligibility of such a child continues.  In Letter from Anonymous, the OSEP stated:

> If a student previously had been evaluated as having a disability and was determined to be in need of special education by a school district in North Carolina and is currently seeking to enroll in another school district in North Carolina, Part B [of the IDEA] imposes on both the State and local agencies an ongoing obligation to ensure that FAPE is provided to those students in conformity with an IEP. . . .
>
> If a copy of the child's IEP is available, whether from the parents or the former school district, the new school district can implement that IEP if the parents are satisfied with it and the new school district determines that the old IEP is appropriate and can be implemented as written.  If the child's current IEP is not available, or if either the new school district or the parent believes that it is not appropriate, an IEP meeting would have to be conducted.  This meeting should take place within a short time after the child enrolls in the new school district (normally within one week). . . .  It would be inconsistent with the responsibility to provide FAPE, however, if the child were placed, even temporarily, without appropriate special education services.

Letter to Anonymous, 25 IDELR at 527, copy attached as Exh. A (ECF No. 20-1) to Parents' Brief.  The OSEP noted that, while a school district's obligations as to how it begins to provide services to a student transferring from out of state are not the same, "[i]n all cases, the State and

the local school district in which the student is enrolling must ensure that the rights of the student with a disability and the student's parents are not compromised when a transfer occurs." *Id.*

25.     In addition, as the Parents point out, *see* Parents' Brief at 9-10, in response to a request for clarification as to the responsibilities of a new public agency for a child with a disability who moves during the summer, the Office of Special Education and Rehabilitative Services ("OSERS") stated: "Section 614(d)(2)(a) [of the IDEA] is clear that at the beginning of each school year, each LEA [local educational agency], SEA [state educational agency], or other State agency, as the case may be, must have an IEP in effect for each child with a disability in the agency's jurisdiction[,]" Assistance to States for the Education of Children With Disabilities and Preschool Grants for Children With Disabilities, 71 Fed. Reg. 46,540, 46,682 (Aug. 14, 2006).

26.     As the Hearing Officer observed, *see* Limitations Decision at 14-15, caselaw, as well as federal and state special education provisions pertaining to the rights of children attending private schools located within a public school district, suggest that a unilateral placement in a private school does not, in itself, terminate a child's IDEA eligibility.  In *Wissahickon*, the United States District Court for the Eastern District of Pennsylvania held that, when parents unilaterally placed their IDEA-eligible child in a private school, during which time the child's prior IEP expired, then reenrolled him in the public school district, the school district met its procedural obligations by developing a new IEP upon his re-enrollment and being prepared to implement it. *See Wissahickon*, 2011 WL 13572, at *11 ("[B]ecause IDEA requires that a public school district make a FAPE available to all disabled students residing within the district, school districts must be prepared to develop an IEP and to provide FAPE to a private school child if the child's parents re-enroll the child in public school.") (citation and internal

quotation marks omitted).  *See also, e.g.*, 20 U.S.C. § 1412(a)(3)(A) & (10)(A) (public school districts must locate, identify, and evaluate children with disabilities enrolled by their parents in private schools and make available certain special education services, if not the full panoply available to public school students); MUSER § IV.4.G(1)(b) & (h) (same); *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1041 (5th Cir. 1989) (dispute over mainstreaming was not rendered moot by parents' placement of disabled child in private school; "Although Daniel no longer attends public school, he remains a citizen of the State of Texas and, thus, remains entitled to a free appropriate public education in the state.  Given Daniel's continued eligibility for public educational services under the EHA [Education of the Handicapped Act], the mainstreaming controversy remains capable of repetition.").[11]

27.   Against this backdrop, the District makes too much of the fact that federal and state regulations spell out the obligation of a school district to provide a FAPE to, and adopt or develop and implement an IEP for, children transferring from one public agency to another within the same school year, but not children transferring from private schools.  *See* District's Brief at 12-14.  As the Parents argue, *see* Parents' Brief at 12, these regulations can reasonably be construed only as providing guidance with respect to the specific situations addressed.  The District's construction, that they delineate the universe of situations in which a once-identified child remains eligible to receive a FAPE upon transfer to a public school district, places them in tension with statutory mandates that an eligibility decision must be reevaluated at least once every three years and cannot be altered absent certain safeguards.[12]

---

[11] The EHA is the "IDEA's predecessor statute[.]"  *School Union No. 37 v. United Nat'l Ins. Co.*, 617 F.3d 554, 559 (1st Cir. 2010).

[12] Subsequent to the issuance of the Hearing Decision, the Maine Commissioner of Education seemingly sided with the District's interpretation of relevant Maine regulations in stating, in his November 17, 2011, answer to the frequently asked question, "What is the obligation of a SAU to provide services at the beginning of the school year (*continued on next page*)

28.     For all of the foregoing reasons, the Hearing Officer correctly held that the District withheld information from the Parents that was required to be provided to them pursuant to the IDEA.  The District, erroneously believing that SM's eligibility had expired and that he would need to be re-referred for an eligibility evaluation, in effect de-identified him without providing written notice of that action and accompanying procedural safeguards advising the Parents of their right to challenge it.  *See* 20 U.S.C. §§ 1415(b)(3) & (c)(1), 1414(c)(5)(A); MUSER §§ VII.4, App. I to XV (written notice).

### c.  Whether the Parents Were Prevented From Requesting a Hearing

29.     I turn next to the District's challenge to the Hearing Officer's finding that the withholding of required information prevented the Parents from requesting a hearing regarding SM's effective de-identification.  The District argues that the Hearing Officer wrongly rejected its argument that, for three reasons, the lack of provision of safeguards in the fall 2007 did not prevent the Parents from then exercising their right to due process: that (i) the Parents had received safeguards in the past and, therefore, should be imputed knowledge of their due process rights, (ii) the Parents did not appear dissatisfied with the decisions made at the time and, therefore, apparently would not have challenged them, and (iii) the procedural safeguards do not address the point that is now asserted as an IDEA violation.  *See* District's Brief at 15-17.  I find no fault with the Hearing Officer's rejection of these points.

---

to a child with an IEP who transfers to the SAU during the summer months[,]" that "*so long as* the child comes to the SAU with a current (non-expired) IEP, the SAU must provide a FAPE to the child[.]"  District's Brief at 13 (emphasis added).  Yet, for the reasons discussed above, this is a misinterpretation of the relevant Maine regulations, which mirror federal rules.  In any event, to the extent that state law confers less protection to disabled students than the IDEA, the IDEA controls.  *See, e.g., Evergreen Sch. Dist. v. N.F.*, 393 F. Supp.2d 1070, 1075 (W.D. Wash. 2005).

### 1.  Constructive Notice

30.    On the first point, the Hearing Officer found that (i) the facts were inconclusive as to whether the family received procedural safeguards from Portland in 2006 and, (ii) even if they did, that did not moot their argument that they were prevented in the fall of 2007 from exercising their due process rights.  *See* Limitations Decision at 17.

31.    As the Hearing Officer found, there is no conclusive evidence that the Parents even received procedural safeguards from Portland in 2006.  They testified that they had no memory of receiving those safeguards and, on a search of their files, could not find any therein. *See Ms. Doe* at 75; *Mr. Doe* at 99.  Even though there are documents addressed to the Parents indicating that procedural safeguards were enclosed, there is no written acknowledgement from the Parents that they actually received them.  *See, e.g*., Record at 151-52, 160, 177.  On this record, the Hearing Officer cannot be said to have erred in finding that the Parents met their burden of demonstrating that they did not earlier receive procedural safeguards.

32.    In any event, even if the Parents did receive a copy or copies of procedural safeguards in 2006, that is not dispositive of the question of whether a lack of safeguards in the fall of 2007 prevented them from exercising their right to a hearing at that time.  First, while the Parents may have known generally of the right to a due process hearing, they did not know that the actions taken by the District in the fall of 2007 entitled them to such a hearing.  *See, e.g*., *Ms. Doe* at 35; *Mr. Doe* at 128-29.  Second, as the Hearing Officer noted, *see* Limitations Decision at 17, at least one district court has rejected the notion that a past provision of procedural safeguards suffices to put parents on "constructive notice" of their rights with respect to a later school decision, viewing the procedural safeguards as sufficiently complex that even the required contemporaneous notice might suffice to put parents only on constructive, rather than actual,

notice of their rights, *see El Paso Indep. Sch. Dist. v. Richard R. ex rel. R.R.*, 567 F. Supp.2d 918, 948-49 (W.D. Tex. 2008).  While, in so finding, the *El Paso* court was not construing the withholding exception to the statute of limitations, its ruling nonetheless is instructive, and the Hearing Officer properly followed it here.

### 2.   Concurrence in Section 504 Plan

33.    The Hearing Officer next supportably rejected the District's argument that the Parents were not prevented from pursuing their hearing rights in the fall of 2007 because they were, at that time, content with the section 504 supports that the District offered for SM.  *See* Limitations Decision at 17.  While it is true that the Parents expressed no disagreement with the section 504 supports offered at that time, they were deprived of critical information: the District had misinformed them that SM would have to be referred for an evaluation of his special education eligibility, a process that entails testing and takes a number of weeks, before special education services could be provided to him.   The Parents, therefore, were under the misimpression that only by accessing section 504 supports could they obtain prompt help for SM and avoid subjecting him to a special education reevaluation.  Had the Parents known that SM remained eligible for special education services, there is no reason to believe that they would have been content with an offer of section 504 services instead.

### 3.   Content of Safeguards

34.    Finally, the Hearing Officer correctly rejected the District's argument that the lack of provision of procedural safeguards did not prevent the Parents from invoking due process in the fall of 2007 because those safeguards do not address the District's alleged error.  *See id.*  The safeguards are not provided in a vacuum; rather, as the Hearing Officer noted, in offering section 504 supports in lieu of special education, the District was required to provide the Parents prior

written notice of a change in SM's identification as IDEA-eligible.  *See* 20 U.S.C. §§ 1415(b)(3) (school district must provide written notice of proposed change in child's identification), 1415(c)(1) (foregoing notice must apprise parents, *inter alia*, of procedural safeguards).  This written notice would have apprised the Parents that they were eligible to access due process rights with respect to the action at issue.

### ii.  Denial of a FAPE (Sixth, Seventh Grades)

35.     The District next challenges the Hearing Officer's finding that it violated its child find and referral obligations during SM's sixth- and seventh-grade school years.  *See* District's Brief at 17-22.  I conclude that her decision on this point was correct.

36.     The Hearing Officer ruled that the District violated its child find obligations to SM in the fall of 2007 by failing to recognize that, upon his transfer, he remained IDEA-eligible and, alternatively, even if he was not then IDEA-eligible, by failing to refer him immediately for special education services.  *See* Hearing Decision at 20-26.  She found that the violation continued until SM ultimately was referred for special education services in eighth grade.  *See id.* at 25-26.

37.     As the Parents argue, *see* Parents' Brief at 15-16, a failure to develop and implement an IEP providing special education services to an IDEA-eligible student is a sufficiently serious procedural violation as to constitute, on its face, a substantive denial of a FAPE, *see, e.g., Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 238-39 (2009) ("[W]hen a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under IDEA as a failure to provide an adequate IEP."); *Blackman v. District of Columbia*, 277 F. Supp.2d 71, 79 (D.D.C. 2003) ("[T]he failure to provide an IEP, the failure to hold a due process hearing, or the failure to provide a written

determination in a timely manner after requests for an IEP meeting or a hearing have been made constitutes the denial of a free appropriate public education as required by the IDEA. Where there is a denial of a free appropriate education because no hearing has been held and no determination has been issued, and a proper placement therefore has not been made, there results a *per se* harm to the student[.]") (citation omitted); *Justin G. ex rel. Gene R. v. Board of Educ. of Montgomery Cnty.*, 148 F. Supp.2d 576, 584 (D. Md. 2001) ("It is undisputed that no IEP was developed for the 1998-1999 school year. Such a violation goes to the heart of the district's ability to provide a FAPE and resulted in a denial thereof."); *Parent v. Gorham Sch. Dep't*, Case No. 07.020H, slip op. at 18 (Me. Dep't of Educ. Jan. 5, 2007) ("Because the Gorham School Department was, and continues to be, obligated to prepare a 2006-2007 IEP for the student and has admittedly failed to do so, Gorham has failed to provide the student with a free and appropriate public education, thereby violating the IDEA.").

38.     In this case, of course, SM was not completely bereft of supportive services: he received accommodations through a section 504 plan. Nonetheless, courts have recognized that a section 504 plan typically is not an adequate substitute for an IEP. *See, e.g., Muller on Behalf of Muller ex rel. Muller v. Committee on Special Educ. of E. Islip Union Free Sch. Dist.*, 145 F.3d 95, 105 n.9 (2d Cir. 1998) ("Although the provision of an IEP under the IDEA will sometimes satisfy a district's § 504 obligations, the converse is not generally true.") (citations omitted); *W.H. ex rel. B.H.  v. Clovis Unified Sch. Dist.,* No. CV F 08–0374 LJO DLB, 2009 WL 1605356, at *24 (E.D. Cal. June 8, 2009), *partially withdrawn on other grounds*, 2009 WL 5197215 (E.D. Cal. Dec. 22, 2009) ("District erroneously continued to provide a Section 504 plan rather than develop an IEP to provide a FAPE tailored to Student's unique needs. Both section 504 and IDEA have been interpreted as requiring states to provide a free appropriate

public education to qualified handicapped persons, but only IDEA requires development of an

IEP and specifically provides for transition services to assist students [to] prepare for a post-high

school environment.  Under the statutory scheme, the school district is not free to choose which

statute it prefers.") (citations and internal quotation marks omitted).

39.     The District argues, in effect, that the section 504 plan was an adequate substitute

for an IEP for SM in the sixth and seventh grades in view of the Parents' and Dr. Hunter's

acquiescence in the plan, which incorporated Dr. Hunter's recommendations, and SM's receipt

of educational benefits, as evidenced by his grades, his NWEA scores, and the testimony of his

teachers, who reasonably believed that he did not require special education services to benefit

from his education.  *See* District's Brief at 19-22.  The District adds that SM's TerraNova test in

September 2010 indicated how well he had actually performed the previous school year, with

strong scores in math and reading.  *See id*. at 26.

40.     Yet, as the Hearing Officer found:

The differences between the student's Section 504 plan of sixth and seventh grade
and the IEP he was eventually provided in the spring of his eighth grade year are
major.  During the time that the student was educated under the Section 504 plan,
he was provided accommodations as to classroom and homework expectations
and the only direct service he received was a half-hour of weekly counseling.  As
the school psychological evaluator noted, the Section 504 remediations were not
sufficient to meet the student's needs.

In contrast, under the IEP of eighth grade, the student received six[] and[] three-
quarters hours per week of specially designed instruction as well as social work
services.  As noted above, the IEP also contained personalized goals, a transition
plan, and accommodations to be provided the student.  The student's ability to
access his education improved with his transition to the IEP.  All of these factors
lead to a conclusion that the school district's failure to identify the student in sixth
grade was not merely a procedural violation.

Hearing Decision at 39-40.

41.     That SM required direct, specially designed instruction and personalized goals in sixth and seventh grade is evidenced by:

A.      The comment of his main teacher in sixth grade that he was "off task in all of his content classes, distracting himself and others, and really not interested in school work."  Record at 215;

B.      The report of all three of his sixth grade teachers in May 2008 that he had "very severe impairments" across all domains, including the notation of concerns that he was distracted and often lost in his own world.  *Id*. at 220, 222-23, 225-26;

C.      The report of the Parents that, by late May 2008, SM was "on heavy supervision at home" due to symptoms of severe depression.  *Id*. at 217;

D.      The Parents' resort to supplementing the section 504 plan by (i) funding an academic tutor, Ms. Pappas, for the summer of 2008 and the first two months of the 2008-09 school year, *see Mr. Doe* at 111-12, (ii) providing SM the incentive of a laptop reward if he did well academically, *see id*. at 114, and (iii) spending countless hours of their own time trying to hold him accountable to his assignments, at the cost of serious damage to the relationship between SM and his father, *see id*. at 113, 954-55.  After the Parents rewarded SM with the laptop, his performance again slipped, with one teacher commenting that he stopped trying.  *See* Record at 250; and

E.      The District's own observation that work completion remained an issue in seventh grade, but when SM's teachers directly required him to work on and complete work, he usually did so.  *See* District's Brief at 21.

42.     These struggles culminated, in eighth grade, in a crisis in which SM began to fail classes, shut down altogether, and become "dark" emotionally.  *See* Record at 933, 1095, 1107,

1134, 1138, 1142; *Goodwin* at 695-96.  Notably, during that year, the District's evaluator, school psychologist Peggy Bickford, found that (i) over time, there had been inconsistencies in holding SM accountable for producing work and demonstrating proactive learning strategies, (ii) he was consciously choosing not to engage with few consequences, (iii) he was at great risk for failure in high school without behavioral supports in place, (iv) until he was held accountable for his behavior, there likely would be little change, and (v) his school adjustment did not appear to be remediated by the section 504 accommodations.  *See* Record at 885.

43.     In sum, the District violated the IDEA, denying SM a FAPE, when it did not recognize him as an IDEA-eligible student until partway through his eighth grade year and provide the full panoply of services that he required.[13]

---

[13] The District points to the following as evidencing the lack of any educational harm to SM in sixth and seventh grades: that, (i) although in sixth grade, SM's teachers indicated that his work habits needed improvement in many categories, his grades that year ranged from "partially meets" to "meets" and generally trended upward, (ii) in several subjects in sixth grade (physical education, technology, computer, art, and health), SM's grades ranged from "meets" to "exceeds," (iii) between the fall of 2007 and the spring of 2009, SM's NWEA test scores improved, and he finished at the 81st percentile in reading and the 38th percentile in math, (iv) the general consensus was that SM did even better in seventh grade than in sixth grade, (v) SM's teachers testified that, in seventh grade, he seemed more attentive and willing to complete his school work, (vi) although work completion remained an issue in seventh grade, when SM's teachers directly required him to work on and complete work, he usually did so, (vii) SM's grades in seventh grade were in the average range, at least as good as in sixth grade, and moving up over time, (viii) emails provided by the family indicate some difficulty with work completion, particularly early in the seventh-grade school year, most notably in Spanish, but with clear improvement over the school year, (ix) all of SM's providers thought that he had benefited from his program in seventh grade, and (x) SM's NWEA test scores improved between October 3, 2008, and May 8, 2009.  *See* District's Brief at 20-21.  In my view, the Record as a whole reflects SM's ongoing struggles in the absence of adequate supports.  For example, he received some "does not meet" grades in sixth grade in reading, social studies, and Spanish, and his grades trended downward over the course of that year in reading and social studies and were variable in Spanish.  *See* Record at 942-43.  His NWEA scores generally trended downward in math (from the 44th percentile in fall 2007 to the 40th percentile in spring 2008 to the 32nd percentile in fall 2008 to the 38th percentile in spring 2009) and were variable in reading (from the 74th percentile in fall 2007 to the 34th percentile in spring 2008 to the 67th percentile in fall 2008 to the 81st percentile in spring 2009).  *See id.* at 252.  In MEA testing in March 2008, he partially met standards in reading and did not meet standards in math.  *See id.* at 213-14.  While some of his grades rose in the second trimester of seventh grade, others fell.  *See id.* at 250.  One teacher, Ms. Fenwick, noted that SM's confidence and self-direction had slipped by the end of seventh grade and that he had reverted to not knowing what to do or how to get started.  *See id.* at 738.  Another teacher, Ms. Raber, questioned what happened in the final trimester of seventh grade after SM's parents got him his new laptop, stating, "You were doing so well, and then stopped!"  *Id.* at 250.  To the extent that SM's largely mediocre grades and test scores in sixth and seventh grade can be considered reflective of educational benefit in view of his intellectual potential, his achievements cannot be credited entirely to the section 504 supports.  As noted above, his parents hired a private tutor, used a laptop reward as an incentive, and made intensive efforts to monitor his (*continued on next page*)

### iii.  Tuition Reimbursement

44.     The District next argues that, even if the Hearing Officer correctly ruled that it violated its child find/referral obligation during the relevant time period, the court should overturn or modify the award of reimbursement of SM's 2010-11 Eagle Hill School tuition on the bases that (i) SM did not suffer a compensable educational harm, (ii) tuition reimbursement cannot be awarded as a form of  compensatory education, (iii) the Parents failed to provide the required timely notice to be eligible for tuition reimbursement, and (iv) the Eagle Hill placement was not appropriate.  *See* District's Brief at 22, 24-35.  The Parents dispute these points and, in addition, argue that the inappropriateness of the District's 2010-11 IEP offer provides an alternative basis for reimbursement.  *See* Parents' Brief at 17-28.  I agree with the Parents that the Hearing Officer properly awarded reimbursement of 2010-11 Eagle Hill tuition and expenses as compensation for the deprivation of a FAPE through most of middle school.  Hence, I do not reach the Parents' alternative argument that, contrary to the finding of the Hearing Officer, the 2010-11 IEP was inappropriate.

45.     Under the IDEA, the court has the power to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). "[B]y empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." *Burlington,* 471 U.S. at 370. "Reimbursement" is not damages, but rather payment of "expenses that [the school] should have paid all along and would have borne in the

_____

homework assignments and work with him to complete them – efforts that proved costly to the relationship between SM and his father.  Ms. Fenwick and Ms. Raber both found that SM's performance improved when they provided him individual attention, *see Raber* at 792; *Fenwick* at 806-07, an intervention beyond the scope of those set forth in his section 504 plan, *see* Record at 934, 940.  Finally, throughout sixth and seventh grades, SM struggled with depression and a lack of self-confidence related at least in part to school, culminating in his emotional shutdown and receipt of several failing grades in the fall of his eighth-grade year.  *See, e.g*., Record at 205, 217, 222, 225, 717, 719, 1009; *Ms. Doe* at 39-48; *Mr. Doe* at 113-18; *JM* at 487-88; *HM* at 497-99; *Goodwin* at 631-32.

first instance had it developed a proper IEP." *Id.* at 370-71.  After *Burlington,* the federal courts began awarding compensatory education as "appropriate relief" for violations of the EHA.  *See Pihl v. Massachusetts Dep't of Educ.,* 9 F.3d 184, 188 (1st Cir. 1993); *see also Diaz-Fonseca v. Puerto Rico,* 451 F.3d 13, 31 (1st Cir. 2006). "[C]ompensatory education is not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA." *C.G. v. Five Town Cmty. Sch. Dist.,* 513 F.3d 279, 290 (1st Cir. 2008).  A school district's responsibility for compensatory educational services does not depend on the vigilance of the parents, *see, e.g., Maine Sch. Admin. Dist. No. 35 v. Mr. R. ex rel. S.R.*, 321 F.3d 9, 20 (1st Cir. 2003), or on a finding that the school district acted in bad faith or egregiously, *see, e.g., M.C. ex rel. J.C. v. Central Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996).  Rather, "a student who fails to receive appropriate services during any time in which he is entitled to them may be awarded compensation in the form of additional services at a later time."  *Pihl*, 9 F.3d at 187.

### a.  Educational Harm

46.     As did the Hearing Officer, *see* Hearing Decision at 39-40, I reject the District's argument that SM suffered no compensable educational harm as a result of the lack of provision of special education services for nearly the entirety of his middle school education.  SM had a longstanding, disability-related history of extreme difficulty focusing on and completing schoolwork.  As a result, despite his intelligence, he struggled to access any benefit from his education.  That he was able, in the absence of special education services, to avoid failing grades in sixth and seventh grade with the benefit of supports by both his parents and some of his teachers beyond those called for in his section 504 plan strengthens, rather than blunts, the force of the Parents' argument.  Beyond this, the absence of proper educational supports for an

extended period of time lowered SM's self-esteem and exacerbated his depression and disaffection from school, eventually culminating in a psychological withdrawal in eighth grade that rendered him essentially unavailable to be educated at all.[14]

### b.  Use as Compensatory Education

47.    I also reject, as did the Hearing Officer, *see* Hearing Decision at 40-42, the District's contention that compensatory education cannot, as a matter of law, take the form of tuition reimbursement, *see, e.g.*, District's Reply at 12 ("[R]eimbursement orders are never an appropriate form of compensatory education in those situations when the year for which reimbursement is sought is a year when appropriate programming is offered by the school.").  It is true, as the District points out, *see* District's Brief at 28, that "when [the First Circuit] has used the term 'compensatory education,' it has usually assumed that the remedies available involve prospective injunctive relief, which would not encompass tuition reimbursement[,]" *Ms. M. ex rel. K.M. v. Portland Sch. Comm.,* 360 F.3d 267, 273-74 (1st Cir. 2004).  Yet, in none of the three First Circuit cases relied on by the District – *Ms. M*, *Diaz-Fonseca*, and *Mr. I.* – did the First Circuit ever hold that tuition reimbursement is unavailable as a matter of law as

---

[14] In its reply brief, the District elaborates on its argument that the award was, at the least, overly generous, contending that, because the Hearing Officer ruled that the March 2010 and subsequent IEPs were reasonably calculated to provide SM with a FAPE, the extra services provided in one or more of those IEPs should have served as the benchmark for any compensatory education award.  *See* District's Reply at 13-14.  The District asserts that it is not arguing that compensatory education should always be calculated on an "hour for hour" basis but, rather, that, in this case, the most compelling measure of any educational harm done to SM is the difference between services provided in the absence of an IEP and those provided through the IEP(s) that the Hearing Officer upheld.  *See id.* at 14.  This is not a persuasive basis on which to disturb the Hearing Officer's award.  While it may be difficult to quantify the extent of harm done, the Hearing Officer reasonably concluded, on this record, that SM's year at Eagle Hill served to compensate for his lengthy period of lack of appropriate services, that is, to place him in the position he would have occupied but for the District's transgressions.  *See, e.g., Millay ex rel. Y.M. v. Surry Sch. Dep't*, No. 1:07-cv-00178-JAW, 2011 WL 1122132, at *10 (D. Me. Mar. 24, 2011) (rec. dec., *aff'd* May 23, 2011) ("Compensatory education serves to replace the educational services the child should have received in the first place and should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.") (citation and internal quotation marks omitted); *see also, e.g., Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 523 (D.C. Cir. 2005) ("[T]his cookie-cutter approach [of hour-for-hour awards of compensatory education] runs counter to both the 'broad discretion' afforded by IDEA's remedial provision and the substantive FAPE standard that provision is meant to enforce.").

compensatory education.  In *Ms. M*, the First Circuit took care to note that it held only that tuition reimbursement was unavailable to Ms. M as a form of compensatory education because she had failed to deliver the requisite notice to the school district, clarifying, "we need not determine when claims of compensatory education are generally cognizable."  *Ms. M*, 360 F.3d at 273-74 (footnote omitted).  In *Diaz-Fonseca*, the First Circuit rejected the notion that tuition reimbursement can include "prospective relief in the amount of future educational expenses" but upheld an award of reimbursement of tuition already paid.  *See Diaz-Fonseca*, 451 F.3d at 31. Finally, in *Mr. I.*, the First Circuit upheld a denial of tuition reimbursement on the basis that a private school placement was inappropriate.  *See Mr. I.*, 360 F.3d at 23-25.  As the Parents suggest, *Ms. M* and *Mr. I.* stand, at most, for the proposition that "when the parents fail a required element of the tuition reimbursement remedy, they are not entitled to reimbursement under the label of compensatory education."  Parents' Brief at 20-21 n.4 (citation and internal quotation marks omitted).

48.    In addition, as the Parents point out, *see id*. at 20-21, IDEA statutory and regulatory provisions do not bar an award of tuition reimbursement as compensatory education, *see* 20 U.S.C. § 1412(a)(10)(C)(ii) (authorizing reimbursement remedy "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that [private school] enrollment"); 34 C.F.R. § 300.148(c) (authorizing reimbursement remedy "if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate").  In this case, although the District made a FAPE available to SM for the 2010-11 school year, it did not make a FAPE available to him in a timely manner prior to his enrollment at Eagle Hill – that is, from September 2007 to March 2010.

49. Finally, as the Parents suggest, the broad equitable power afforded to hearing officers and courts to remedy IDEA violations counsels against a narrow view of compensatory education as necessarily consisting only of an award of future services, *see* Parents' Brief at 20-21 ("Under the IDEA, it matters not whether parents first purchase necessary compensatory services for the student and then seek reimbursement, or instead commence a due process hearing seeking future compensatory services for the student. Both situations are functionally equivalent and equally available under the law."); *see also Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15-16 (1993) ("[O]nce a court holds that the public placement violated IDEA, it is authorized to grant such relief as the court determines is appropriate. Under this provision, equitable considerations are relevant in fashioning relief, and the court enjoys broad discretion in so doing.") (citations and internal quotation marks omitted); *Draper v. Atlanta Indep. Sch. Sys.*, 518 F.3d 1275, 1286 (11th Cir. 2008) ("We do not read the Act as requiring compensatory awards of prospective education to be inferior to awards of reimbursement. . . . Although it ordinarily has a structural preference for special education in public schools, the Act does not foreclose a compensatory award of placement in a private school."); *Ferren C. v. School Dist. of Philadelphia*, 595 F. Supp.2d 566, 577 (E.D. Pa. 2009), *aff'd*, 612 F.3d 712 (3d Cir. 2010) ("Courts have often awarded compensatory education in the form of tuition reimbursement or an injunction requiring school districts to pay for private school tuition or other services. Compensatory education relief has also, however, taken other shapes. Our Court of Appeals discerned nothing in the text or history suggesting that relief under IDEA is limited *in any way* and concluded that Congress expressly contemplated that the courts would fashion remedies not specifically enumerated in IDEA.") (citation and internal punctuation omitted) (emphasis in original).

50.     For these reasons, the Hearing Officer did not err, as a matter of law, in awarding reimbursement of tuition paid for the 2010-11 school year as compensation for the denial of a FAPE in earlier years (the 2007-08, 2008-09, and part of the 2009-10 school years).

### c.  10-Day Notice

51.     I turn next to the District's argument that tuition reimbursement should not have been awarded because the Parents failed to give the required notification prior to their unilateral withdrawal of SM from public school.  *See* District's Brief at 29-31.  As did the Hearing Officer, *see* Hearing Decision at 42-43, I find this contention, as well, unpersuasive.

52.     An award of tuition reimbursement "may be reduced or denied" if, *inter alia*, "10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency" that "they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense[.]"  20 U.S.C. § 1412(a)(10)(C)(iii)(I); *see also* 34 C.F.R. § 300.148(d); MUSER § IV.4.G(3)(d)(i).

53.     The family applied on June 11, 2010, for SM's admission to Eagle Hill School.  *See* Record at 435.  SM's 2009-10 school year ended on June 21, 2010.  *See* District's Brief at 30; Parents' Brief at 23.  On June 23, 2010, Eagle Hill accepted SM for admission.  *See* Record at 463.  On June 25, 2010, the family forwarded to Eagle Hill a check for half of the annual tuition, plus a deposit, a student fee, and a signed enrollment contract.  *See id*. at 467.  Pursuant to that contract, tuition payments were nonrefundable after June 1, 2010, and acceptance of enrollment constituted an agreement to pay the full academic year's charges.  *See id*. at 473-74.  Eagle Hill considered SM to be an enrolled student as of July 1, 2010.  *See id*. at 474, 477.  By

letter dated August 13, 2010, the family informed the District that SM was being withdrawn.  *See id.* at 478.

54.     The District argues that, on these facts, the Parents should have provided the requisite notification no later than 10 business days before July 1, 2010, the date that SM was considered fully enrolled at Eagle Hill, and most likely no later than 10 business days before June 21, 2010, the last day of the 2009-10 school year.  *See* District's Brief at 30.  By these calculations, the notice was more than one month overdue.

55.     The Hearing Officer rejected this view, observing that, in *Sarah M. v. Weast*, 111 F. Supp.2d 695 (D. Md. 2000), a district court held that the enrollment of a child in private school does not necessarily equate with her removal from public school and, when Sarah M.'s parents enrolled her in a private school in May 1998 to begin classes in the fall of 1998, they provided sufficient notice of her removal by notifying the school district in July 1998.  *See* Hearing Decision at 43; *Sarah M.*, 111 F. Supp.2d at 700-01.  The Hearing Officer observed that, in *Sanford Sch. Dep't v. Maine State Educ. Agency*, 47 IDELR 176 (Me. Dep't of Educ. Oct. 31, 2006), an MDOE hearing officer followed the rationale of *Sarah M.*, awarding tuition reimbursement in circumstances in which a family signed an agreement with a private school and paid a deposit on July 21, 2005, but notified the school district of the student's intended withdrawal from public school on August 9, 2005.  *See* Hearing Decision at 43; *Sanford*, 47 IDELR at 822-23, copy attached as Exh. B (ECF No. 20-2) to Parents' Brief.

56.     In *Sarah M.*, the United States District Court for the District of Maryland held that the parents' enrollment of a child in private school at a time when she was still attending public school was not tantamount to her removal from public school.  *Sarah M.*, 111 F. Supp.2d at 700-01.  The court reasoned:

> [T]he fact remains that the federal statute speaks in terms of "removal."  It does
> not tie the required notification to an occurrence at the private school (the act of
> inscription) but to an occurrence at the public school (the act of removal).
> Moreover "removal" implies a present or at least an imminent physical action.
> The Court therefore concludes that "removal" in the federal statute pertaining to
> prior notice requirements refers to the actual physical removal of the child from
> public school.  If the removal occurs during the school year, the ten business days
> count back from the date of the intended actual physical removal.  If the decision
> to enroll in private school occurs during a summer recess, the ten business days
> mark from the beginning of the public school year (or sooner if the child is
> physically placed in private school).

*Id*. at 701 (footnote omitted).

57.     The District criticizes this logic, arguing that there is no "summertime tolling" of
the rule and that when, as here, a child has stopped attending public school, has been enrolled in
a private school, and the family has accepted admission and paid a non-refundable $36,000
deposit toward that placement, one should be able to conclude that the student has been
withdrawn from public school.  *See* District's Brief at 31.  In addition, in its reply brief, the
District argues that *Sarah M*. clashes with this court's ruling on the 10-day notice issue in *Mr. I*,
in which, the District says, this court made clear that the analysis focuses on the date that a
parent decides not to return a child to public school.  *See* District's Reply at 15-16.

58.     I am unpersuaded that the Hearing Officer's approach conflicts with the cited
dictum in *Mr. I*.  In *Mr. I*, the school district had argued that parents' notice was untimely in
circumstances in which a student did not return to public school after a suicide attempt, and the
parents did not provide a written notification of their intent to enroll her in private school until
afterward.  *See Mr. I*, 416 F. Supp.2d at 169 & n.16.  The court held that Maine's then 10-day
notice provision controlled.  *See id*. at 169.  That provision, in turn, was "more protective of
parents than the federal policy" in that it required that notice be given at least 10 days prior to the
enrollment of a child in private school.  *Id*. (footnote omitted).  The court ruled that, because the

parents had given written notice to the school district on January 5, 2004, and again on January 28, 2004, and the student still had not been officially accepted at the private school as of the end of February 2004, she was not enrolled as of the latter time, and the notice was timely. *See id.* at 170. In a footnote, the court observed:

> In a case such as this, where a child is in effect "removed" from school by a suicide attempt (or any other hospitalization, for that matter), pegging that date as "the removal date" would mean that [the student] could never qualify for reimbursement. That cannot be the proper analysis. Thus, the "removal" date must occur later, when the parents decide not to return her to public school.

*Id.* at 169 n.16.

59.     The District points out that Maine since has adopted the federal version of the 10-day notice provision. *See* District's Reply at 16; MUSER § IV.4.G(3)(d)(i)(II). It argues that, with respect to that provision, the court in *Mr. I* made clear that the focus, for purposes of analyzing when a child is "removed," is solely on when a family decides not to return the child to public school. *See* District's Reply at 16.

60.     The District reads too much into the *Mr. I* dictum, which addressed only cases in which a student is suddenly and unexpectedly removed from school as a result of a hospitalization. The court did not purport to construe, for all purposes, the meaning of the word "removal" in the federal 10-day notice provision. *See Mr. I*, 416 F. Supp.2d at 169 n.16. In any event, even assuming that *Mr. I* signaled that, in all cases, removal occurs when a parent decides to remove a child from public school, the court did not have occasion to consider the circumstances in which that decision fairly can be said to have been made at any time of the year, let alone over the summer recess. *See id.*

61.     The *Sarah M.* court, by contrast, squarely confronted the question of removal during summer recess, adopting a pragmatic, fair approach similar to that outlined by this court

with respect to the question of removal following a school-year suicide attempt or other hospitalization.  I perceive no clash.[15]

62.     In this case, the Parents' notice, which was delivered considerably more than 10 days before the start of the public school year or before SM was physically placed at Eagle Hill, was timely.

### d.  Appropriateness of Eagle Hill Placement

63.     The District finally challenges the award of tuition reimbursement on the basis that Eagle Hill was not an appropriate placement for SM.  *See* District's Brief at 32-35.

64.     "[T]he right to reimbursement of private special education expenses depends in the first instance on whether the private school placement was 'proper.'"  *Mr. I.*, 480 F.3d at 23.  To be proper, a private school placement must be "reasonably calculated to enable the child to receive educational benefit"; it fails to do so "if the private school does not offer at least some element of special education services in which the public school placement was deficient."  *Id*. at 24 (citation and internal quotation marks omitted).  Nonetheless, the placement need not "meet every last one of the child's special education needs."  *Id*. at 25.

65.     The Hearing Officer deemed the Eagle Hill placement appropriate, noting that:

A.     Eagle Hill is a special purpose school in which all students have learning disabilities, each student receives an IEP, each student's school days are well-structured, the students' classes have a low student-teacher ratio, the schedule of terms allows students the opportunity to pursue interests while meeting core requirements, the program

---

[15] As the *Sarah M*. court observed, it is problematic to equate the signing of a private-school enrollment contract with the withdrawal of a child from public school for at least two reasons: (i) a child might still be attending public school when such a contract is signed, as was the case in *Sarah M*., *see Sarah M*., 111 F. Supp.2d at 700-01, and (ii) a parent signing such a contract over the summer might nonetheless be preserving the option to return his or her child to public school in the fall, *see id*. at 701 ("A parent fairly committed to private school and willing to assume liability for a substantial financial commitment may still be disposed to reconsider.") (footnote omitted).

uses a system for the earning of privileges and freedoms, and the entire program is designed to accommodate the students' learning disabilities. *See* Hearing Decision at 44.

    B.    Although social work services were not a consistent part of SM's program, they were made available during a period of crisis in the spring. *See id.*

    C.    SM's placement at Eagle Hill was successful and allowed him to gain mastery of skills that he lacked, become engaged in his education and work product, and advance academically. *See id.*

    D.    SM's conflict with another student during the spring of his year at Eagle Hill was handled effectively by school staff and did not render the placement inappropriate. *See id.*

    66.    The District faults this conclusion on the bases that (i) there was no evidence that SM required a residential, as opposed to a day, placement, (ii) SM was subjected to harassment and bullying sufficient to cause physical illness and require him to remain out of school for at least a full week to recover, and (iii) the placement failed to provide SM with any of the specialized instruction in his unique areas of need. *See* District's Brief at 32-35.

### 1. Least Restrictive Environment

    67.    On the first point, the District argues that reimbursement should be denied, or at least reduced to the cost of private day treatment, because SM did not require a residential placement, which was not the least restrictive placement that would have addressed his needs. *See id.* at 32-33 & n.15. However, parents need not meet the "least restrictive environment" test in demonstrating that a private placement is proper under the IDEA. *See, e.g., Rome Sch. Comm. v. Mrs. B.,* 247 F.3d 29, 33 n. 5 (1st Cir. 2001) (propriety of a unilateral placement "is a different issue, and one viewed more favorably to the parent, than the question whether this residential

placement was required in order to provide a free appropriate education to DC."); *Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.,* 190 F.3d 80, 84 (3d Cir. 1999) (agreeing that "imposition of the least-restrictive environment requirement on private placements would vitiate the parental right of unilateral withdrawal"; noting, "An appropriate private placement is not disqualified because it is a more restrictive environment than that of the public placement."); *Babb ex rel. Babb v. Knox Cnty. Sch. Sys.,* 965 F.2d 104, 108 (6th Cir. 1992) (same).

## 2. Bullying

68.     On the second point, the District argues that the bullying and hazing of SM was sufficiently severe, and had a sufficiently strong impact on him, to render the Eagle Hill placement inappropriate. *See* District's Brief at 33; *see also, e.g., T.K. ex rel. L.K. v. New York City Dep't of Educ.*, 779 F. Supp.2d 289, 318 (E.D.N.Y. 2011) ("Where bullying reaches a level where a student is substantially restricted in learning opportunities she has been deprived of a FAPE."). It adds that, in view of the fact that Maine students have a right not to experience this type of behavior at school, it seems remarkable to conclude that a private school is appropriate for a student who is so harassed that he is physically sickened and emotionally unable to attend school for a period of time. *See* District's Reply at 14-15 (citing 20-A M.R.S.A. §§ 6553-54). Nonetheless, Maine public schools are not required to eradicate bullying, a seemingly impossible task. Rather, they are expected to adopt policies and procedures designed to deal effectively with it. *See, e.g.*, 20-A M.R.S.A. § 6554(5)(F) & (I) (Maine public schools must adopt, *inter alia*, "[a] procedure for promptly investigating and responding to incidents of bullying" and "[a] procedure to remediate any substantiated incident of bullying to counter the negative impact of the bullying and reduce the risk of future bullying incidents"). That is what Eagle Hill did in this case. With the benefit of Eagle Hill's swift and effective response, SM was able to return to

school, resume his studies, resolve the conflicts that led to the bullying, and finish the year with a strong academic performance.   The bullying, thus, did not rise to a level sufficient to substantially restrict SM's learning opportunities at Eagle Hill or otherwise render the placement inappropriate.

### 3.   Nature of Services Provided

69.    On the third point, the District contends that Eagle Hill offered none of the special education services in which SM's public school education was deficient.   *See* District's Brief at 34.  It asserts that, at Eagle Hill, SM (i) received no instruction in executive functioning and no counseling, (ii) had no courses that specifically taught social skills, (iii) took a course that at least nominally taught "study skills" in only one of the nine terms of the school year, (iv) received no specialized assistance after school hours, (v) refused to participate in any of the school's after-school social activities until very late in the school year, and (vi) did his homework in the evening in his dorm room, with proctors checking in regularly on him.  *See id*. The District argues that Eagle Hill offered even less, by way of special education services, than did the program at issue in *Mr. I.*, which the First Circuit deemed inappropriate because it offered none of the special education services recommended by experts or the student's PET.  *See id.* at 35; *Mr. I*, 480 F.3d at 25.

70.    The Parents counter that Eagle Hill is a special-purpose school focusing exclusively on meeting the needs of students with disabilities, which it does in myriad ways, including (i) a highly structured program, with a detailed daily schedule that includes academic call-backs by teachers and daily proctored study halls to ensure that all of the students receive the academic assistance they require, (ii) a low-ratio, relationship-based instructional model, permitting teachers to focus on and develop students' individual skills and talents, (iii) an

academic year divided into nine brief terms of 21 school days each, permitting students wide latitude to pursue their interests while meeting core requirements and not falling behind in their work, and (iv) a level system for students to earn privileges and freedoms, including the self-study that SM attained after only a few months in the program on account of his positive behaviors. *See* Parents' Brief at 27.

71.     The Parents have the better argument.  In *Mr. I.*, the private school at issue offered none of the recommended interventions of (i) direct teaching of social skills or "any roughly equivalent intervention[,]" (ii) cognitive behavioral therapy, and (iii) close supervision or one-on-one tutoring.  *See Mr. I.*, 480 F.3d at 24-25.  The parents in *Mr. I.* argued that some of the school's distinguishing features, such as its small student-faculty ratio, approximated the recommended interventions, but the First Circuit disagreed, observing: "[T]he reasonableness of the private placement necessarily depends on the nexus between the special education required and the special education provided.  Here, the connection between, for example, the one-on-one tutoring recommended for LI and the relatively small student-faculty ratio boasted by [the private school] was more than remote enough to support the district court's conclusion that the choice of the private school was not reasonably calculated to ensure that LI received educational benefit[.]"  *Id.* at 25.  In this case, by contrast, Eagle Hill provided interventions bearing a close nexus to some of the core interventions recommended for SM.

72.     Among the critical goals of the September 2010 version of SM's 2010-11 IEP were the following: (i) "[SM] will organize himself in order to meet classroom expectations by completing classwork and homework, handing in completed work, and being prepared for class by having a pencil and doing assigned work during independent work time, and earning grades of C or better in all academic classes by March 2011[,]" Record at 807, and, (ii) as a behavioral

goal, "[i]n the area [of] academic engagement, given predetermined incentives, [SM] will earn a point 100% of the time ... for completing class time work and 1 out of 2 of his possible points 100% of the time for completing and passing in homework, and bringing materials to class for each class, daily by March 2011[,]" *id*. at 813.  SM also had a social work goal "to seek and accept assistance from the high school social worker to address psychosocial challenges that arise in the high school setting from a current 0% of the time to 25% of the time by March 2011." *Id*. at 815.  To help him achieve these and other goals, SM was to be provided specially designed instruction by a special education teacher six times per four-day rotation for 55 minutes each, specially designed instruction in behavior once weekly for 55 minutes, and the services of a social worker twice monthly for 30 minutes each.  *See id*. at 819.

73.    Eagle Hill's program, as well, aimed to remediate SM's profound deficits in work completion and class participation, providing coaching, direct instruction, and behavioral supports all aimed at assisting him to acquire and demonstrate the skills necessary to come prepared to class, participate in class, and complete the majority of his assignments.  As Ms. Kaplan testified, Eagle Hill's interventions included (i) a system of call-backs by teachers regarding uncompleted work, (ii) the proctoring of study time, including regular monitoring of SM's progress completing homework in his dorm room, with hands-on assistance as needed, (iii) the provision of a "study skills" class, and (iv) a system of earning privileges and freedoms in exchange for positive behaviors.  *See Kaplan* at 413-14, 419-20, 427, 456, 463.  While Eagle Hill did not supply certain other services contained in SM's IEP, such as specific instruction in social skills, *see* Record at 811, that is of no import.  Eagle Hill provided services that were reasonably calculated to, and in fact successfully did, remediate SM's extreme, disability-related

difficulties in homework completion and class participation.  Eagle Hill, thus, was an appropriate

placement for purposes of this tuition reimbursement claim.

### B.  Parents' Appeal

74.     The Parents cross-appeal that portion of the Hearing Officer's decision holding

that the District's 2011-12 IEP for SM was reasonably calculated to offer him a FAPE.  *See*

Parents' Brief at  28-34.

75.     The question of whether, *ex ante,* an IEP is reasonably calculated to confer a

student with a FAPE is analyzed somewhat differently than that whether, *ex post,* an IEP as

implemented has conferred a FAPE. *See, e.g., Ross ex rel. Ross v. Framingham Sch. Comm.,* 44

F. Supp.2d 104, 117 (D. Mass. 1999), *aff'd,* 229 F.3d 1133 (1st Cir. 2000) ("[A] claim about

implementation is necessarily distinct from a claim that an IEP was not appropriate at the time

that it was adopted (that is, from the '*ex ante*' perspective.)").

76.     For purposes of *ex ante* analysis, "a FAPE has been defined as one guaranteeing a

reasonable probability of educational benefits with sufficient supportive services at public

expense." *G.D. v. Westmoreland Sch. Dist.,* 930 F.2d 942, 948 (1st Cir. 1991). "Generally

speaking, the IDEA oblige[s] the School District to furnish [the student] with a FAPE sufficient

to confer some educational benefit." *Mr. R.,* 321 F.3d at 11-12; *see also, e.g., Nack ex rel. Nack*

*v. Orange City Sch. Dist.,* 454 F.3d 604, 614 (6th Cir. 2006) ("[T]he IDEA does not guarantee

success – it only requires a school to provide sufficient specialized services so that the student

benefits from his education.") (citation and internal quotation marks omitted).  As the First

Circuit has further elaborated:

> The IDEA does not promise perfect solutions to the vexing problems posed by the
> existence of learning disabilities in children and adolescents.  The Act sets more
> modest goals: it emphasizes an appropriate, rather than an ideal, education; it
> requires an adequate, rather than an optimal, IEP.  Appropriateness and adequacy

are terms of moderation.  It follows that, although an IEP must afford some educational benefit to the handicapped child, the benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential.

The IDEA also articulates a preference for mainstreaming.  Translated into practical application, this preference signifies that a student who would make educational progress in a day program is not entitled to a residential placement even if the latter would more nearly enable the child to reach his or her full potential.  And, moreover, when the bias in favor of mainstreaming is married to the concepts of appropriateness and adequacy, it becomes apparent that an IEP which places a pupil in a regular public school program will ordinarily pass academic muster as long as it is reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Lenn v. Portland Sch. Comm.,* 998 F.2d 1083, 1086 (1st Cir. 1993) (citations and internal quotation marks omitted).  *See also, e.g., Milford Sch. Dist. v. William F.,* No. 97-1506, 1997 WL 696108, at *5 (1st Cir. Nov. 10, 1997) ("A FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice, or even the best choice.") (citation and internal punctuation omitted).

77.     The Hearing Officer held that the 2011-12 IEP would have provided SM with a FAPE in that the IEP:

A.      Included goals in organizational and time management skills, study skills, basic math skills, interpersonal skills with peers and adults, behavior related to preparedness in class, participation in class, and completion of assignments, and social work.  *See* Hearing Decision at 34;

B.      Called for five-and-a-half hours of specially designed academic instruction every four days, as well as approximately one hour of behavioral instruction and social work services per week, before and after school coaching, and tutorial services as needed.  *See id.*; and

C.     Included a series of accommodations such as writing down SM's assignments, modifying classroom expectations, providing SM with visual and tactile opportunities to demonstrate understanding, preferential seating, and frequent check-ins. *See id.*

78.     The Hearing Officer observed that the proposed five and a half hours of specially designed instruction was consistent with the six and three-quarters hours of specially designed instruction provided during the last few months of the 2009-10 school year and did not appear to unnecessarily segregate SM. *See id.* at 34-35.  In addition, while she agreed with the Parents that the nature of the tutorial and coaching services was vague, she observed that this was reflective of the fact that SM had not been in the school district for the prior year and, as with the behavioral plan, school staff needed to work with SM in order to fine-tune some aspects of the IEP. *See id.* at 35.

79.     The Parents argue that the District, as the party initiating the hearing request with respect to the 2011-12 IEP, bore the burden of proof that it offered a FAPE.  *See* Parents' Brief at 30.  They contend that the District failed to sustain that burden with respect to the 2011-12 IEP in that:

A.     SM would have been pulled out for special education services for 32 percent of his instructional time, an inappropriate amount of segregation.  *See id.* at 31.

B.     It is unclear whether the specially designed services would have been provided by the special educator, the social worker, or a behavior strategist.  *See id*.

C.     It is unclear how the social worker, who apparently would have been Mr. Scott, would have had the necessary time to work with SM.  *See id*.  Mr. Scott testified that he had a caseload of 100 to 120 students in 2011-12 and that he wished to limit his

IEP-required service time with SM to a maximum of 55 minutes per four-day rotation. *See id.*

  D. School witnesses were not able to clarify how the vague tutorial services as needed and coaching 15 minutes before and after school would have been staffed or implemented or have accommodated SM's needs and schedule. *See id.* at 32.

  E. The IEP would not have focused on the key characteristics necessary to make an educational program successful for SM, as highlighted by his experience at Brewster, including consistent daily advising and mentoring, relationship-based teaching, small-size classes, support services integrated in the classroom setting rather than provided in pull-out sessions, and instruction that draws on high-interest areas for SM and encourages him to develop his significant areas of academic strength. *See id.* at 32-33.

  F. The IEP's behavior intervention plan, which offered a points-based system for rewarding SM with "Malone Money" to obtain his compliance, was virtually certain to fail. *See id.* at 33.

80. The District counters that the First Circuit has recently made clear that, for purposes of the burden of proof in IDEA claims, it does not matter which party requests a hearing – the burden of proof rests with the party challenging the IEP. *See* District's Reply at 17; *see also D.B. ex rel. Elizabeth v. Esposito*, 675 F.3d 26, 35 (1st Cir. 2012) (citing *Schaffer*, 546 U.S. at 62, for the proposition that the burden of persuasion at the hearing level "lies with the party challenging the IEP"). Thus, the District asserts, the family bore the burden in this instance. *See id.* The District contends that the family did not meet this burden in that there was

no evidence offered at hearing criticizing the IEP apart from a generalized critique of the reward system found in the draft behavior plan. *See id.* at 23-24.

81.     The Parents rejoin that the First Circuit misconstrued *Schaffer*, which stands for the proposition that the burden of persuasion "in an administrative hearing challenging an IEP is properly placed on the party seeking relief." Parents' Reply at 3 (quoting *Schaffer*, 546 U.S. at 62). In their view, the District, as the party seeking a ruling that the 2011-12 IEP was appropriate, was the party seeking relief, and failed to carry its burden of persuasion. *See id.* at 3-5.

82.     I am unpersuaded that the First Circuit misread *Schaffer*. The First Circuit explained that, in its view, a school district "preemptively seeking an administrative determination that a proposed IEP would comply with the IDEA" is not the party seeking relief. *D.B.*, 675 F.3d at 35 n.3. In support of that interpretation, it noted that the Supreme Court had stated: "[T]he rule applies with equal effect to school districts: If they seek *to challenge* an IEP, they will in turn bear the burden of persuasion before an ALJ." *Id.* (quoting *Schaffer*, 546 U.S. at 62) (emphasis added by First Circuit).

83.     The Parents, therefore, bore the burden at hearing of demonstrating that the 2011-12 IEP did not confer SM a FAPE and bear the burden on appeal of demonstrating that the Hearing Officer's decision to the contrary was wrong. *See, e.g., Schaffer,* 546 U.S. at 51.

84.     The Parents do not meet this burden. The 2011-12 IEP was reasonably calculated to provide SM a FAPE, in that it provided several supports reasonably calculated to remedy his extreme difficulties focusing on and completing schoolwork, including direct specialized academic instruction, before and after school coaching, tutorial services as needed, and a behavior intervention plan. That the IEP was vague as to the identity of professionals who

would provide certain services did not invalidate it.  Through the IEP, the District offered to commit the resources of appropriate professionals for specific periods of time to assist SM in acquiring time management, organizational, academic, and social skills.  That the IEP was vague as to the precise nature of coaching and tutorial services to be provided also did not invalidate it.  The precise nature of those services necessarily would depend on the issues with which SM was struggling on any given day.  Finally, that the Parents and Dr. Hunter judged the Malone Money behavior plan too juvenile to succeed does not invalidate the IEP.  The District acknowledged that the success of the behavior plan hinged on buy-in by SM, a key player who was not at the table when the IEP was developed and whose input would have been sought had he attended Greely High.

85.    To the extent that the Parents measure the District's offered 2011-12 IEP against the yardstick of SM's Brewster experience and complain that the IEP comes up short, they ask more than is required of an IEP.  *See, e.g.*, *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008) ("[T]he obligation to devise a custom-tailored IEP does not imply that a disabled child is entitled to the maximum educational benefit possible.").

### III.  Conclusion

For the foregoing reasons, I recommend that the instant cross-appeals be **DENIED** and that the Parents' request for attorney fees and costs be **DEFERRED** pending final adjudication of the instant appeal, at which time the Parents may seek attorney fees and costs pursuant to Local Rules 54.2 and 54.3.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14)*

*days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 29th day of November, 2012.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge